767 N.W.2d 74 (2009)
277 Neb. 984
In re INTEREST OF ANGELICA L. and Daniel L., children under 18 years of age.
State of Nebraska, Appellee,
v.
Maria L., Appellant.
No. S-08-919.
Supreme Court of Nebraska.
June 26, 2009.
*79 Jeffrey R. Kirkpatrick and Sheri A. Wortman, of McHenry, Haszard, Hansen, Roth & Hupp, P.C., Lincoln, and Brian D. Buckley, Christopher M. Huck, and R. Omar Riojas, of DLA Piper, L.L.P. (U.S.), Seattle, WA, for appellant.
Monika E. Anderson, Special Assistant Attorney General, and Robert J. Cashoili, Deputy Hall County Attorney, for appellee State of Nebraska.
Vincent M. Powers, of Vincent M. Powers & Associates, Lincoln, and Shari Lahlou, Barbara H. Ryland, and Christine Sommer, of Crowell & Morning, L.L.P., Washington, DC, for amicus curiae Legal Momentum.
Victor E. Covalt III, of Ballew & Covalt, P.C., Lincoln, and John De Leon, of Chavez & De Leon, P.A., South Miami, FL, for *80 amicus curiae Consulate General of Guatemala.
Michael Kneale, guardian ad litem.
HEAVICAN, C.J., CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.
McCORMACK, J.

I. NATURE OF CASE
In this appeal, we must balance the conflicting right of an undocumented immigrant, Maria L., to maintain custody of her children, with the State's duty to protect her children who came with her or were born in this country. Maria failed to take her child, Angelica L., for a followup doctor's appointment despite a diagnosis of respiratory syncytial virus (RSV) and her worsening condition, which failure led to Maria's arrest and deportation. Maria's other child, Daniel L., and Angelica were placed in temporary emergency custody with the Nebraska Department of Health and Human Services (DHHS), and they were not allowed to reunite with Maria when she was eventually deported to Guatemala. Despite Maria's attempts to satisfy a DHHS case plan to regain custody, her parental rights were eventually terminated.
Because of the State's involvement with the family, Maria's parental rights under Nebraska's juvenile law have collided with the sanction imposed on her by immigration law. We must now address the needs of these vulnerable children who are caught in the clash of laws, culture, and parental rights that occur when their parents cross international boundaries. But this responsibility initially lies with child protection workers and courts in the State's juvenile system. In the present case, the task of the child protection workers, and consequently our task, would have been much easier if the Guatemalan consulate had been included in these proceedings earlier. We ultimately conclude that the evidence was insufficient to terminate Maria's parental rights.

II. BACKGROUND

1. MARIA AND HER CHILDREN
Maria, a native of Guatemala, is the mother of four. In addition to Angelica and Daniel, Maria has two other sons. Maria's native language is Quiché, and Spanish is her second language. Maria first came to the United States in 1997 to forge a better living for herself and her two sons, her only children at that time. During the period that Maria lived in the United States, her two sons remained with family members in Guatemala.
In 1998, Maria lived in Michigan and worked in a slaughter-house. Maria gave birth to Daniel on February 13, 1998. When Daniel was approximately 5 years old, Maria went back to Guatemala to take care of her ailing mother. Maria left Daniel in Michigan under her sister's care while she was gone. Maria's mother ultimately passed away, and about 11 or 12 months after leaving the United States, Maria returned by illegally crossing the border through Arizona.
In January 2004, Maria gave birth to Angelica. It is unclear whether the birth occurred shortly before or after Maria reentered the United States in 2004. Regardless, Angelica was born about 2 months prematurely.
By the time Angelica was 1 month old, Maria, Daniel, and Angelica were living in Grand Island, Nebraska. Their whereabouts during Angelica's first month of life are unclear. Angelica received medical attention and care for the first time at 1 month of age, when Maria brought Angelica to Saint Francis Medical Center (Saint *81 Francis) in Grand Island. At that time, Angelica weighed 3 pounds 9 ounces and was suffering from dehydration, malnutrition, a urinary tract infection, and a left pulmonary branch stenosis. Angelica remained in the hospital for several days and was eventually discharged on March 3, 2004. By the time of her discharge, Angelica weighed 4 pounds 14 ounces and she was in good condition.
The medical records regarding Angelica's first hospital visit indicate that Maria expressed her desire and determination to live in the United States. Aware of Maria's desire to remain in the United States, Angelica's treating physician warned Maria that if she did not follow her instructions, then she would recommend that Maria be deported. Angelica's treating physician was concerned about Maria's medical judgment because Angelica had not been provided medical care sooner. Angelica's treating physician told Maria that if she did not follow up on Angelica's medical care, she would notify Child Protective Services.
Shortly after Angelica was discharged from Saint Francis, Maria voluntarily sought the assistance of "Healthy Starts"a program that provides education on the growth and development of newborn babies. Maria sought the assistance of Healthy Starts because she wanted information on how to properly care for Angelica. Through Healthy Starts, Maria met Lisa Negrete, a Healthy Starts employee. Negrete began making regular checks on Angelica at her home to follow up with Angelica's care. She also made regular visits to the house of Angelica's babysitter. The record reveals that after Maria became involved with Healthy Starts, DHHS was contacted on certain occasions regarding Angelica's and Daniel's well being. But after investigation, all reports were deemed unfounded.
On April 3, 2005, Maria brought Angelica to Saint Francis because Angelica had a fever and was having problems breathing. Angelica was diagnosed with RSV. Through a Spanish language interpreter, Maria was instructed to give Angelica nebulizer treatments every 4 to 6 hours as needed and "to follow up with [the doctor] in two days or return if she is worse."
Maria did not take Angelica back to the doctor because she thought that Angelica was recovering, so there was no need to return to the hospital. According to Negrete, however, who observed Angelica at the babysitter's home sometime between April 5 and 7, 2005, Angelica had a temperature of over 100 degrees, was lethargic, smelled foul, and had on clothing stained with vomit. Negrete also observed that there was no medication in Angelica's bag. Negrete told the babysitter to advise Maria to take Angelica to the hospital right away.
Negrete contacted DHHS on April 7, 2005, stating that Angelica was diagnosed with RSV and was not improving or receiving any of her medication. The April 7 report also contained allegations of abuse, but these allegations were never substantiated and were deemed to be unfounded. Based on this report, Collete Evans, a DHHS social worker, and Doug Cline, a Spanish-speaking police officer, went to Maria's home to follow up on the report. When they arrived at Maria's home, Maria answered the door, but she misidentified herself as the babysitter. Maria told Evans and Cline that Maria had left while she was sleeping. Maria later explained that when she saw the police, she was afraid she would lose her children and be deported.
Later that day, Evans and Cline went to the babysitter's home and discovered that the woman who had previously identified herself as the babysitter was actually Maria. *82 Cline observed Maria nursing Angelica, and in his opinion, Angelica appeared to be sick. He testified that Angelica cried out but that she had no tears. Evans testified similarly, stating that Angelica appeared lethargic, was warm to the touch, smelled foul, and had no tears when she attempted to cry.
Maria was immediately arrested for obstructing a government operation, and Angelica was placed in emergency protective custody. Daniel was at school and was also placed into protective custody. Cline explained that Daniel was placed in protective custody "simply to provide care for him while [Maria] was incarcerated." Angelica was placed in protective custody because Maria allegedly neglected her by not providing proper medical care.
After Angelica was removed from her home and placed in the custody of DHHS, Angelica was taken to the emergency room and was hospitalized for 4 days. Once her symptoms were under control, Angelica was released to foster placement.
Shortly after her arrest. Maria was taken into custody by U.S. Immigration and Customs Enforcement. The original obstruction charges against Maria were not pursued. Maria was scheduled to be deported on May 10, 2005. On April 8, 2005, the State filed a juvenile petition alleging that Angelica and Daniel were juveniles as defined by Neb.Rev.Stat. § 43-247(3)(a) (Reissue 2004) because they lacked proper parental care by reason of the fault or habits of Maria (count I); because Maria neglected or refused to provide proper or necessary assistance, education, or other care necessary for their health morals or well being (count II); and because they were in a situation or engaged in an occupation dangerous to their life or limb or injurious to their health (count III).
On April 13, 2005, the court held an initial hearing. Maria attended the hearing, but was not represented by counsel. Through a Spanish language interpreter, she was informed of her rights and the nature of the petition. Maria generally denied the allegations. Because Maria was incarcerated, the court ordered that Angelica and Daniel should remain in the temporary custody of DHHS pending adjudication.
The State was aware that Maria's incarceration was a temporary condition pending deportation. However, the State determined that it would not be returning the children to Maria to take with her to Guatemala "based on concerns [it] had for their safety." During the month that Maria was incarcerated pending deportation, she was provided only one visit with her children.
Although aware that Maria would no longer be in the country by that time, the court set the adjudication hearing for July 11, 2005. Maria was therefore not present at the hearing. She was instead represented by her legal counsel. At the State's request, the court struck count I of the petition. In support of its remaining allegations, the State offered as evidence the affidavit of Shawn LaRoche, a Child Protective Services worker employed by DHHS; a report prepared by the court-appointed special advocate; and the genetic testing report demonstrating that Maria was Angelica's biological mother. Maria's counsel presented no evidence on Maria's behalf.
LaRoche's affidavit, which was the original affidavit relied on when the children were removed, summarized the events of April 7, 2005, and stated that in LaRoche's opinion, it would be in the best interests of the children to be placed in the temporary custody of DHHS. The court concluded that immediate reunification of *83 Angelica and Daniel in the parental home would be contrary to their health, safety, and welfare because Maria had been deported to Guatemala. The court ordered temporary custody of Angelica and Daniel to remain with DHHS and ordered DHHS to prepare a plan of rehabilitation. DHHS placed the children in at least three different foster families until they were placed, on September 6, 2005, with their current foster parents.

2. CASE PLANS
The court held dispositional hearings on September 8 and December 8, 2005, and June 15, 2006. At all of the dispositional hearings, Maria was unable to attend and counsel appeared on Maria's behalf. At the September 8 hearing, the court reiterated its finding that placement of the children with their foster parents was appropriate and that reunification would be contrary to the children's health, safety, and welfare. The court adopted the case plan, which was prepared by Lisa Hannah, a protection and safety employee for DHHS. The court instructed Maria's counsel to advise her that failure to comply with the case plan, combined with the children's being out of the home for 15 or more of the most recent 22 months, would trigger a motion to terminate parental rights.
The permanency goal of the case plan was reunification. Other goals of the September case plan included providing for the basic needs of the children, providing a safe and nurturing environment for the children, achieving timely permanency for the children, and addressing any individual mental health needs Maria may have had to effectively parent. Additionally, the case plan listed several tasks for Maria, including maintaining a job, maintaining an appropriate residence, not associating with individuals that are involved in criminal activities, and scheduling and completing a psychological evaluation. Maria was to keep in regular contact with the case manager, including providing notification within 48 hours of any change in employment, residence, or contact information; maintaining contact with the children through telephone calls and letters at least once a month; keeping the case manager informed of any progress or contacts with professionals; and taking a parenting class and providing a certification of completion to the case manager. Because Maria was in Guatemala and DHHS had kept the children in Nebraska, physical visitation was not possible. Contact with the children was instead established through telephone calls. Although Maria wanted to initiate telephone calls with her children, she was not provided with a telephone number to contact the children and any contact with the children had to be initiated by their foster parents.
A few months after arriving in Guatemala, Maria contacted two missionaries, William Vasey and Pastor Tomas DeJesus, seeking help regaining custody of her children. Maria provided Hannah with Vasey's contact information and gave her permission to discuss her case with Vasey and DeJesus. The record indicates that Maria contacted DHHS several times, inquiring about how she could get her children back. All of Maria's communications with DHHS took place through the use of Spanish language interpreters because Hannah did not speak Spanish.
Hannah informed Vasey about the general goals and requirements of the case plan in August 2005. Sometime in February 2006, Hannah spoke to Maria over the telephone and through a Spanish language interpreter, and she read Maria the contents of the case plan. Hannah admitted that Maria never received a physical, translated copy of the case planeven *84 though DHHS generally provided translated copies to other non-English speakers.
On March 10, 2006, Hannah contacted Maria after learning that Maria had some questions about the case plan. At that time, Hannah told Maria that they were having difficulty arranging parenting classes and counseling for her, so Maria would "have to take the initiative for that" herself.
On June 2, 2006, Maria provided Hannah with DeJesus' contact information. Hannah testified that she discussed the requirements of the case plan with DeJesus and that DeJesus said he would follow through on providing her with progress reports, counseling, and setting up parenting education classes for Maria. From that point on, most of Hannah's communications about Maria's case were with DeJesus, and Maria assumed that he provided Hannah with the information she needed regarding Maria's compliance with the case plan.
Although it was Hannah's job to monitor Maria's progress, Hannah admitted she could not do so because of Maria's location. Nevertheless, it was Hannah's opinion that Maria had failed to comply with the case plan requirements. Hannah testified that for the most part, Maria maintained contact with her and the children but that there was a period of time when she did not know how to contact Maria. Hannah stated further that she never received verification that Maria had completed a parenting class and that she knew that parenting classes were available in Guatemala. Hannah admitted that the parenting class requirement was not based on Hannah's personal observations of Maria, but was more or less a fail-safe matter. Finally, Hannah explained that she never received a psychological evaluation of Mariaalthough she did receive a written report discussing the mental health issues that women face in Guatemala.

3. TERMINATION OF PARENTAL RIGHTS HEARINGS
Based on Maria's failure to strictly comply with the case plan and the passage of more than 15 months of the most recent 22 months in foster care, on September 22, 2006, the State filed a motion to terminate parental rights. An initial hearing on the matter was held on November 9, and a hearing on the motion to terminate was scheduled for January 22, 2007. The case was continued several times so that Maria could obtain an entry visa to participate in the termination hearings. Hearings on the motion to terminate were eventually held on December 17 and 18, 2007, with Maria present.
During the hearings, the court heard testimony from various witnesses including Dr. John Meidlinger, a clinical psychologist; the foster mother; Hannah; Cline; Margorie Creason, a protection and safety worker of DHHS; Maria; Negrete; Evans; and Vasey.
Meidlinger testified that he believed it would be in both Angelica's and Daniel's best interests to remain with their foster parents. Meidlinger testified at length regarding the emotional trauma the children would suffer if they were uprooted from their foster parents and sent to live in Guatemala. Meidlinger stated that the children were currently well adjusted to their foster care and had a positive relationship with their foster parents. It was Meidlinger's opinion that if the children were sent to Guatemala, they would "experience culture shock, disorientation, fearfulness, sadness and anger." He posited that Daniel would need special help and reassurances expressing those feelings, but that the adjustment would not be as difficult for Angelica. Meidlinger opined that Daniel would suffer long-term effects *85 such as "anger and confusion on a long-term basis; a sense of alienation or loss, a sense of sadness and depression, and likely future difficulties developing close and trusting relationships with other people." Meidlinger predicted that Angelica would suffer short-term problems similar to Daniel's, including anxiety, depression, culture shock, problems developing close interpersonal relationships, and a lifelong sense of loss and grief if she were returned to Maria in Guatemala.
Meidlinger testified that the standard of living in Guatemala is lower than the standard in the United States, the people are poorer, and there are less economic opportunities. Meidlinger was unfamiliar with the educational system or athletic opportunities available in Guatemala.
When asked what characteristics a parent needed for Angelica and Daniel to appropriately adjust, he stated:
They would have to have a parenting figure who was completely committed to them, who had a foundation herself in the culture and some stability, both emotional and economic, and she would have to be very skilled in understanding that the children were going to have a variety of emotional reactions, that they could not be punished out of those reactions; that they needed to be allowed to express those feelings; and that they would have a depth of love and compassion; that would help the children connect to that person, that mother, probably; and, that bond of attraction and caring would be enough for the children to let go of some of the feelings of loss about what they no longer have.
Meidlinger did not testify as to his opinion whether Maria could meet the children's needs. Nor did he indicate that he had any concern that Maria would physically harm the children or any concern regarding her attachment to them.
Negrete likewise stated that she never observed any signs of physical abuse to Angelica. She testified that Angelica's emotional attachment to Maria seemed to decrease after Maria started working full time. According to Negrete, Maria's behavior with Daniel was appropriate but unaffectionate.
Hannah explained that the children were removed from Maria's custody due to concerns about Angelica's health. After that, normal visitations were impossible due to Maria's living in Guatemala. Hannah admitted that Maria stayed in contact with her children through telephone conversations and that their foster mother would report to Hannah about how the conversations went. Hannah testified that the conversations "went okay."
Creason began working on Maria's case in October 2007, and she testified generally as to her observations of the children as well adjusted to foster care. She noted that all of their medical and dental care is paid for. She also expressed concerns over Maria's past history of medical neglect of Angelica and Maria's "non-performance" of the case plan.
Maria testified through the aid of a Spanish language interpreter. Regarding the circumstances in 2005 which lead to her arrest and the children's being removed from her custody, Maria stated:
[The doctor] said that I was supposed to come back on Tuesday. I didn't have a ride and I didn't have a car to take her back, and that's why I didn't come back. After those days I thought that she was getting better, that's why I decided I wasn't going to take her back.
Maria explained her living situation in Guatemala. She lives in Guatemala with her two other sons, who are 18 and 15 years old. There is a hospital within 10 minutes, walking distance, from her home, *86 and Maria testified that she can receive free medications for herself and her children. Maria testified she has beds and bedding, food, pots, pans, running water, electricity, and clothing. Maria also explained that there are at least three schools where she lives that the children could attend. Maria testified that she has maintained employment. The record indicates that together with her two older sons, the family earns a suitable income by Guatemalan standards. When asked about the breathing treatments Angelica may require if she gets ill again, Maria stated that she would take Angelica to the doctor in Guatemala and that she can get the medicine Angelica needs.
Vasey discussed his observations of Maria. Vasey has had close contact with Maria since June 2005. When asked if Vasey had concerns about returning the children to Maria, including whether they would receive proper medical care and education, Vasey testified that he had no concerns and would not hesitate to return the children to Maria. Vasey testified that Maria has strong ties to her community and that the people in her community respect her. Vasey also had no concerns about the education the children would receive in Guatemala. According to Vasey, Maria's two other sons lead healthy lives in Guatemala. Vasey stated he was "really impressed with [Maria's] ability as a caretaker and provider for those boys."
The State did not offer any evidence to rebut the testimony that Maria has established an appropriate residence in Guatemala or that she is a suitable caretaker to her sons in Guatemala.
The court received into evidence Angelica's and Daniel's medical records from 2004 through 2005. Those records show that Maria provided medical care to Angelica and Daniel on several occasions. On April 1, 2004, Maria, concerned about Angelica, brought Angelica to the emergency room because she was crying, would not eat, had a fever, and had not had a bowel movement. The report indicates the diagnosis as "Fussy baby. Nasal congestion." Angelica was discharged in stable condition. On July 2, Maria sought emergency medical attention for Angelica because she had a "[f]ever and [was] not eating." Angelica was diagnosed with an ear infection and fever, and she was discharged in stable condition. On July 18, Maria brought Angelica into the emergency room again because Angelica was fussy and had a fever. The records indicate that Angelica was diagnosed with an ear infection in both ears and gas, and she was discharged in stable condition. On February 20, 2005, Maria brought Angelica to Saint Francis complaining of a fever, cough, and runny nose. The medical notes indicate that Angelica was in "no acute distress," and she was diagnosed with an upper respiratory infection and ear infection.
Maria also sought medical care for Daniel. The record indicates that Daniel was taken to the emergency room on July 2, 2004, because he was vomiting. The medical records state, "Apparently he has vomited x five tonight. He started at approximately 4:30. He has not been eating well but has been taking fluids such as juice and pop with no difficulty since. He has been acting pretty normal but his mom brings him in for evaluation." Daniel was diagnosed with gastroenteritis and was discharged in stable condition with no pain. On February 22, 2005, Maria again sought medical attention for Daniel. Daniel was diagnosed with influenza and sent home.
Two home studies were entered into the record regarding Maria's ability to care for her children in Guatemala. One home study was prepared by Josefina Maria Arellano Andrino, a child and adolescent *87 agency supervisor on behalf of the "Child & Adolescent Agency" in Guatemala, and the other home study was prepared by Vasey. Both home studies were prepared at the State's request.
In the home study prepared by Vasey, he stated that "Maria is able to provide a very stable life to her family." Vasey's home study indicates that Maria has provided for her two other sons with appropriate clothing and food, and she earns a suitable income. Vasey's home study also stated, "[Maria] has a reputation in town as being an excellent mother." Vasey described Maria as being surrounded by extended family and as having strong ties to her community.
After termination proceedings were already underway, DHHS requested Andrino's home study to obtain a report that "was a little more neutral" than the home study prepared by Vasey. The Andrino study contained conclusions similar to Vasey's. Andrino discussed Maria's living conditions, explaining that Maria has maintained suitable housing. The home study states that Maria, "in spite of her cultural and low education level, has shown to be a woman that struggles and makes efforts to give her children a better quality life." Andrino considers it to be in the children's best interests that they be reunited with Maria. As such, she recommended that the children be returned to Maria.

4. COMMUNICATIONS WITH GUATEMALAN CONSULATE
Hannah Testified That She Faxed A Letter To The Consulate For Guatemala In Houston, Texas, In July 2005, Inquiring About Maria. Hannah Also Testified That On February 14, 2007, She Contacted The U.S. Embassy In Guatemala To Get Information And To Request A Home Study. The Record Contains Letters From An Attorney For The Guatemalan Consulate General In Miami, Florida, And The Guatemalan Consulate In Denver, Colorado. The Letter From The Colorado Consulate Indicated It Never Received Notification Concerning Maria's Case Prior To The Commencement Of The Termination Proceedings. The Letters Also Indicate That There Were Services Available In Guatemala Designed To Monitor And Protect The Well Being Of Children And That Transportation Is Available For The Children To Return To Guatemala To Live With Maria.

5. DISPOSITION
The juvenile court rejected Maria's argument that it lacked jurisdiction due to violations of the Vienna Convention on Consular Relations (Vienna Convention),[1] concluding that its jurisdiction was authorized by § 43-247. The court stated:
Even if this Court were to find that notification was required, which it does not, the testimony of the case worker in this case indicated that phone calls were made and faxes were sent to the Guatemalan Consulate and, in fact, the file in this case indicates contact at a later point by counsel undertaking representation of the Guatemalan Consulate.
The court next held that the State had met its burden of proof and that termination was in the children's best interests. The court questioned whether parental unfitness needed to be established in this case in order to terminate parental rights, but it concluded that, regardless, the State provided sufficient evidence of Maria's unfitness. Specifically, the court stated that Maria "either A) embarked on *88 an unauthorized trip to the United States with a newborn premature infant or B) gave birth to a premature infant in the United States. In either event, it is clear that [Maria] did not provide the basic level of prenatal and postnatal care...." Additionally, the court stated Maria's fear of deportation "serves as no excuse for her failure to provide the minimum level of health care to her children."
With regard to Maria's compliance with the case plan, the court concluded that despite "serious obstacles," DHHS "went to great lengths to communicate the requirements and expectations" of the case plan to Maria and that Maria failed to comply with those requirements. In so concluding, the court stated "there is no requirement that [DHHS], to effectuate a case plan, lead a mother by the hand to the services." The court remarked that "[b]eing in the status of an undocumented immigrant is, no doubt, fraught with peril and this would appear to be an example of that fact."
The court noted that neither Angelica nor Daniel were familiar with Guatemala or had ever met their two half siblings and that both children were thriving in the only locality they have ever known with the only parental figures they have ever known. Accordingly, the court terminated Maria's parental rights.
Maria filed a motion for new trial alleging that new evidence was available to establish that she had received and completed parenting classes. Maria sought to introduce the new evidence to prove that she had complied with the case plan. When Maria was asked why she had not informed Hannah sooner that she completed a parenting class, Maria testified that she was not asked whether she had completed the parenting class, and she testified that she assumed DeJesus was keeping Hannah informed about the counseling. Maria also maintained that she had a difficult time understanding what people said at the termination hearings, because Spanish is her second language and everyone was talking too quickly. The court denied the motion and concluded that Maria did not sufficiently establish that the information was not available at the time of the termination hearings. Maria appeals.

III. ASSIGNMENTS OF ERROR
Maria assigns, restated and reordered, that the juvenile court erred in (1) concluding that her parental rights should be terminated pursuant to Neb.Rev.Stat. § 43-292(6) and (7) (Reissue 2008), (2) concluding that it was in the children's best interests to terminate her parental rights, (3) concluding that her due process rights were not violated, (4) allowing her counsel to deliver ineffective assistance of counsel, and (5) overruling her motion for new trial. Maria also contends that the court had no jurisdiction to enter any order with respect to Angelica or Daniel.

IV. STANDARD OF REVIEW
Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings.[2] However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other.[3]

V. ANALYSIS

1. JURISDICTION
Maria maintains that the juvenile court lacked jurisdiction to determine custody. *89 Maria argues that once the U.S. Immigration and Customs Enforcement became involved and deportation proceedings were scheduled, the State no longer had jurisdiction and that the State should have deferred to the federal government. Additionally, Maria argues that DHHS failed to comply with the Vienna Convention, article 37,[4] which provides in pertinent part:
If the relevant information is available to the competent authorities of the receiving State, such authorities shall have the duty:
. . . .
(b) to inform the competent consular post without delay of any case where the appointment of a guardian or trustee appears to be in the interests of a minor or other person lacking full capacity who is a national of the sending State. The giving of this information shall, however, be without prejudice to the operation of the laws and regulations of the receiving State concerning such appointments.
Maria argues that although the State did eventually notify the Guatemalan consulate, the notification was delayed and such delay defeated the purpose of the Vienna Convention. Alternatively, Maria maintains that despite the juvenile court's finding that the State complied with the Vienna Convention, the State failed to comply with statutory jurisdictional prerequisites. Thus, Maria argues the State did not have jurisdiction. We conclude that the juvenile court properly exercised jurisdiction over the child custody proceedings.

(a) Federal Jurisdiction Versus State Jurisdiction
Our court has never addressed whether State courts have jurisdiction over child custody disputes when a parent involuntarily faces deportation. However, case law from other jurisdictions indicates that issues concerning child custody are within the province of state jurisdiction, not federal immigration jurisdiction, even when a parent involuntarily faces deportation.[5] The whole subject of domestic relations, and particularly child custody problems, is generally considered a state law matter outside federal jurisdiction.[6] We cannot conclude, simply because a party to this case faces deportation, that federal immigration laws preempt this State's authority to decide matters involving child custody. We have stated that the jurisdiction of the State in juvenile adjudication cases arises out of the power every sovereignty possesses as parens patriae to every child within its borders to determine the status and custody that will best meet the child's needs and wants.[7] As such, the juvenile court properly exercised jurisdiction over Angelica and Daniel.

(b) Compliance With Vienna Convention and § 43-3804
Whether compliance with the Vienna Convention is a jurisdictional prerequisite to parental termination actions involving foreign nationals is an issue of first impression for this court. Although we were presented with the same issue in In re Interest of Aaron D.,[8] we declined to *90 decide whether compliance with the Vienna Convention was jurisdictional. We reasoned that because the juvenile court erred in terminating the mother's parental rights, we did not need to address the mother's remaining assignments of error. However, because the mother raised a potential jurisdictional issue, we took note of her argument that the court lacked jurisdiction based on the State's failure to comply with the Vienna Convention. Additionally, we reasoned that the record was devoid of any evidence regarding whether the Mexican consulate had been informed of the termination proceedings, and as such, we concluded that we could not conduct a meaningful analysis.[9]
Other jurisdictions have considered the same issue and have concluded that compliance with the Vienna Convention is not a jurisdictional prerequisite.[10] In In re Stephanie M.,[11] the California Supreme Court concluded that any delay in notice to the Mexican consulate did not deprive the California court of jurisdiction. In so concluding, the court analyzed and interpreted the language of the Vienna Convention to mean that the jurisdiction of the receiving state is permitted to apply its laws to a foreign national and that the operation of the receiving state's law is not dependent upon providing notice as prescribed by the Vienna Convention.
Other jurisdictions have concluded that state courts do not lose jurisdiction for failing to notify the foreign consulate as required by the Vienna Convention unless the complainant shows that he or she was prejudiced by such failure to notify.[12] Moreover, where there is actual notice, jurisdictions decline to invalidate child custody proceedings based on violations of the Vienna Convention.[13]
In the present case, the record presents conflicting testimony regarding whether and when the Guatemalan consulate was notified about Maria's case. Hannah testified that she sent notification to the Guatemalan consulate of Colorado, but letters from the Guatemalan consulate claim that no such notice was ever received. Based on Hannah's testimony that telephone calls were made and faxes were sent to the Guatemalan consulate and the fact that counsel was later appointed to represent the Guatemalan consulate, the juvenile court concluded that the State had complied with the Vienna Convention. The juvenile court specifically noted that regardless of whether compliance with the Vienna Convention was required, Hannah had made efforts to notify the Guatemalan consulate and did so in compliance with the Vienna Convention. An appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and considers it observed the witnesses.[14] As such, we consider that the juvenile court observed the witnesses and believed one version of the facts over the other. And assuming without deciding that compliance with the Vienna Convention is a jurisdictional prerequisite, we cannot say, based on the record before us, that the juvenile court's finding that the *91 State complied with the Vienna Convention was erroneous.
But Maria argues that the State failed to comply with Neb.Rev.Stat. § 43-3804 (Cum. Supp. 2006) and that such compliance is also a jurisdictional prerequisite. At the time of the juvenile court's decision, § 43-3804(2) stated:
The department shall notify the appropriate consulate in writing within ten working days after (a) the initial date the department takes custody of a foreign national minor or a minor holding dual citizenship or the date the department learns that a minor in its custody is a foreign national minor or a minor holding dual citizenship, whichever occurs first, (b) the parent of a foreign national minor or a minor holding dual citizenship has requested that the consulate be notified, or (c) the department determines that a noncustodial parent of a foreign national minor or a minor holding dual citizenship in its custody resides in the country represented by the consulate.
Section 43-3804 was enacted by the Legislature in 2006, after the children had been removed but before the juvenile court ordered that Maria's parental rights be terminated. Maria argues that § 43-3804 applies retroactively and that the State did not comply with § 43-3804. Because the State did not comply with § 43-3804, Maria argues that the juvenile court did not have jurisdiction.
We have stated that to obtain jurisdiction over a juvenile, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247.[15] As such, we conclude that § 43-3804 does not create a jurisdictional prerequisite to a juvenile court's exercise of jurisdiction. In other words, when the State fails to strictly comply with the requirements of § 43-3804, the juvenile court is not divested of its jurisdiction to make decisions regarding a juvenile of which it properly exercised jurisdiction under § 43-247.
In sum, we conclude that the juvenile court properly exercised jurisdiction over Angelica and Daniel.

2. SUFFICIENCY OF EVIDENCE TO TERMINATE PARENTAL RIGHTS
Before we consider whether the State proved by clear and convincing evidence that termination of Maria's parental rights was in Angelica's and Daniel's best interests, we take a moment and address certain issues regarding the dilemma we are presented with. First, we recognize that the children in this case have lived in the United States and with a seemingly healthy foster home for approximately 4 years. This delay was due, in part, to the difficulties inherent to Maria's location. Our decision in this case will undoubtedly have serious impacts on these children. However, we are faced with deciding whether the children should remain in the United States or be returned to Maria in Guatemala. With that in mind, we now turn to whether the State proved by clear and convincing evidence that termination of Maria's parental rights was in Angelica's and Daniel's best interests.
It is axiomatic that under § 43-292, in order to terminate parental rights, the State must prove, by clear and convincing evidence, that one or more of the statutory grounds listed in this section have been satisfied and that termination is *92 in the child's best interests.[16] And the proper starting point for legal analysis when the State involves itself in family relations is always the fundamental constitutional rights of a parent.[17]
We have explained that the interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by the U.S. Supreme Court.[18] Accordingly, before the State attempts to force a breakup of a natural family, over the objections of the parents and their children, the State must prove parental unfitness.[19] "`[U]ntil the State proves parental unfitness, the child and his [or her] parents share a vital interest in preventing erroneous termination of their natural relationship.'"[20] In other words, a court may not properly deprive a parent of the custody of his or her minor child unless the State affirmatively establishes that such parent is unfit to perform the duties imposed by the relationship, or has forfeited that right.[21]
We have also explained that the fact that a child has been placed outside the home for 15 or more of the most recent 22 months does not demonstrate parental unfitness.[22] Instead, the placement of a child outside the home for 15 or more of the most recent 22 months under § 43-292(7) merely provides a guideline for what would be a reasonable time for parents to rehabilitate themselves to a minimum level of fitness.[23] Regardless of the length of time a child is placed outside the home, it is always the State's burden to prove by clear and convincing evidence that the parent is unfit and that the child's best interests are served by his or her continued removal from parental custody.[24]
When considering whether removal from parental custody is in the best interests of the child, the determination requires more than evidence that one environment or set of circumstances is superior to another. Rather, the "best interests" standard is subject to the overriding presumption that the relationship between parent and child is constitutionally protected and that the best interests of a child are served by reuniting the child with his or her parent.[25] This presumption is overcome only when the parent has been proved unfit.[26]
The juvenile court in this case concluded that the State proved, by clear and convincing evidence, that Maria's parental rights ought to be terminated pursuant to § 43-292(6) and (7) and that such termination was in Angelica's and Daniel's best interests. We determine that the State failed to consider Maria's commanding constitutional interest, and the State failed to rebut the presumption that it is in Angelica's and Daniel's best interests to reunite with Maria.
*93 The State presented several witnesses to testify at the termination hearing, but none of the State's witnesses were asked about Maria's parental fitness and nothing in the record establishes that Maria is an unfit parent. The State and the guardian ad litem argue simply that Maria's failure to provide medical care to Angelicain two isolated instanceswas sufficient to terminate her parental rights. We disagree.
While we recognize and express concern over Maria's medical judgment, we disagree that such error in judgment warranted termination of her parental rights. We have repeatedly said that the law does not require the perfection of a parent.[27]
Maria crossed the border either pregnant or with a newborn infant. We do not know the details of Maria's circumstances while crossing the border, but, regardless, we do not conclude that Maria's attempt to bring herself and her child into the United States, in the belief that they would have a better life here, shows an appreciable absence of care, concern, or judgment. Because of a fear of being deported, and perhaps other circumstances of which we are unaware, Maria was hesitant to seek medical attention for Angelica when she was first born. The record is unclear when Maria became aware that Angelica was not thriving, but the record shows that Maria took Angelica for medical care by the time she was 1 month old. After that, Maria regularly sought medical care for her children, despite her ongoing fear of deportation. On these occasions, the children's illnesses were deemed not serious. When Maria failed to take Angelica to the followup appointment after she was diagnosed with RSV, Maria thought Angelica was getting better and also, she did not have a ride to the appointment. There is no evidence calling into question the sincerity of Maria's assessment of the medical situation. Maria made obvious mistakes in medical judgment, but they are insufficient lapses to establish her unfitness to parent. Moreover, Maria has demonstrated a continual willingness to learn more about how to avoid such mistakes in the future. After Angelica's initial visit to the doctor, which resulted in a 4-day hospital stay, Maria sought advice from Negrete on how to properly care for Angelica. And when Negrete advised Maria to take Angelica to the doctor in 2004, Maria did.
When Maria was questioned at the termination hearing about whether she knew how to provide Angelica with proper medical care, she testified that she would take Angelica to the hospital so the doctor can treat her. Additionally, Maria testified that she has access to free medications and hospitals within walking distance from her home. The evidence presented is that Maria would provide adequate medical care for Angelica and Daniel in Guatemala.
The evidence from the home studies is that Maria has established a stable living environment in Guatemala and can provide for all of her children's basic needs. They also indicate that Maria is a fit parent and that it would be in the best interests of Angelica and Daniel to be returned to Maria in Guatemala.
The juvenile court seemingly ignored the overwhelming evidence provided in the home studies, and the State failed to provide any testimonial evidence rebutting the indications of the two home studies. Instead, the State introduced testimonial evidence attempting to show that it would be in the children's best interests to remain with their foster parents, because *94 living in Guatemala would put them at a disadvantage compared to living in the United States. What we are dealing with here is a culture clash. However, whether living in Guatemala or the United States is more comfortable for the children is not determinative of the children's best interests. We reiterate that the "best interests" of the child standard does not require simply that a determination be made that one environment or set of circumstances is superior to another.[28]
We are mindful that Daniel has always lived in the United States and that Angelica has been in the United States since she was an infant. We also acknowledge that the children seemed to be doing well in their foster home. But unless Maria is found to be unfit, the fact that the State considers certain adoptive parents, in this case the foster parents, "better," or this environment "better," does not overcome the commanding presumption that reuniting the children with Maria is in their best interestsno matter what country she lives in. As we have stated, this court "`"has never deprived a parent of the custody of a child merely because on financial or other grounds a stranger might better provide."'"[29]
The juvenile court expressed concern regarding the children's extended placement outside of the home and for their need to stay in foster placement, "the only circumstances that they have ever known." While we share the same concern regarding the children's extended foster placement, we must protect Maria's commanding constitutional interest. Maria did not forfeit her parental rights because she was deported. We note that this circumstance would not exist had the State allowed Maria to take the children with her to Guatemala. It is especially clear that as to Daniel, as soon as Maria was released from custody and awaiting deportation, Daniel could have been safely returned to her. At oral arguments, when the State was asked why Daniel was placed in custody, the State's only response was that it had received unsubstantiated reports of abuse. And as for Angelica, the record reveals that while Maria was being detained by the U.S. Immigration and Customs Enforcement, Angelica received the medical care she needed and had recovered before Maria was deported.
The government of Guatemala has the resources to monitor the children's well being and Angelica's rehabilitation, and, thus, the State has failed to prove that reunification while Maria continued with her case plan in Guatemala would endanger the children. Instead, the record demonstrates that the State made no efforts to reunify Maria and the children largely because DHHS thought the children would be better off staying in the United States. But so long as the parent is capable of providing for the children's needs, what country the children will live in is not a controlling factor in determining reunification.
The State also maintains that Maria is unfit because she failed to comply with the case plan adopted by the court. It is the burden of the State, and not the parent, to prove by clear and convincing evidence that the parent has failed to comply, in whole or in part, with a reasonable provision material to the rehabilitative objective of the case plan.[30] The State has *95 failed to sustain its burden in this case. While it may be true that Maria did not strictly fulfill every detail of the case plan requirements, Maria clearly progressed, and any deficiencies in following the case plan are inadequate to prove unfitness.
From the beginning, the State was less than helpful in providing Maria with a compliable case plan. Although Hannah acknowledged that case plans are provided to Spanish speakers in their native language, Maria never received a copy of the case plan in her native language. There is no evidence in the record to suggest that Maria ever received a written copy of the case plan in any languagedespite the fact that Hannah had access to Maria's address. Although the case plan was prepared in September 2005, Maria was never directly informed of the contents of the case plan until sometime in February 2006. At that time, Hannah simply read the plan over the telephone to Maria and then told her that she would have to take the initiative herself to comply with the case plan, because Hannah was having a hard time setting up a parenting class or counseling. The record does not contain any evidence showing what efforts Hannah actually made.
Despite this notable lack of guidance on the part of DHHS, Maria progressed and generally complied with the case plan. Maria remained in contact with her children, by telephone, as required by the case plan. Martha testified that she initiated telephone calls between Maria and the children approximately once a month. Additionally, the record shows that Maria has established and maintained a home for herself and her other children in Guatemala. Maria testified, and other evidence confirms, that she has everything her family needs, including running water, a bathroom, pots and pans, dishes, a kitchen table, and beds. Maria is employed, and there is no evidence in the record indicating that Maria associates with individuals involved in criminal activity.
The only two requirements Maria did not seemingly comply with included getting a psychological evaluation and completing a parenting class. Hannah testified that she never received any information indicating Maria was psychologically evaluated but that she did receive a general letter describing the concerns and living conditions of women in Guatemala. Our review of the record reveals that Hannah never informed anyone, including DeJesus, Vasey, or Maria, that the psychological report she received was not sufficient. When Hannah was asked why the case plan required Maria to receive a psychological evaluation, Hannah explained that it was just "common practice" to require it. The record does not indicate that Maria actually suffered from any psychological health issues which would affect her ability to properly care for the children or that the State was actually concerned with Maria's psychological health. As for the parenting classes, Hannah concluded that Maria had failed to comply with this requirement based solely on the failure to hear otherwise. Hannah explained that due to Maria's location, she could not monitor Maria's progress, and thus essentially placed the burden on Maria to show she had met the case plan requirements. We note that despite the fact that Maria was normally available by cellular telephone, Hannah never attempted to call and ask her how she was progressing with the case plan requirements. Even when Maria was again present in the United States for the hearing, the State never even asked Maria the simple question of whether she had completed a parenting class.
*96 Thus, at most, the State proved that Maria failed to submit to a psychological evaluation, which she seemingly understood had been satisfied and which the State admits was not necessary for Maria to become a fit parent. Otherwise, it is clear that Maria made a genuine effort to follow a case plan that was imposed upon her with little guidance. Her failure to follow the plan as thoroughly as DHHS desired is simply not probative of Maria's fitness to parent. The undisputed evidence is that she has been able to establish in Guatemala an appropriate living environment and that she can provide for her children, in accordance with the case plan.
As such, we conclude that the court erred in finding that the State established, by clear and convincing evidence, that termination of Maria's parental rights was in Angelica's and Daniel's best interests. First and foremost, a child's best interests are presumed to lie in the care and custody of a fit parent. The State failed to sustain its burden to prove by clear and convincing evidence that Maria is unfit. This evidentiary failure is related to the State's initial failure to make greater efforts to involve the Guatemalan consulate and keep the family unified. Because the State did not make this effort, it had scant evidence to support its claims that Maria was unable to care for her children.
In conclusion, we are mindful that the children will be uprooted. But we are not free to ignore Maria's constitutional right to raise her children in her own culture and with the children's siblings. That the foster parents in this country might provide a higher standard of living does not defeat that right. Having so concluded, we do not address Maria's remaining assignments of error. An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the controversy before it.[31]

VI. CONCLUSION We conclude that the State properly exercised jurisdiction over Angelica and Daniel. However, the State did not present clear and convincing evidence that termination of Maria's parental rights was in Angelica's and Daniel's best interests. We, therefore, reverse the judgment of the juvenile court terminating Maria's parental rights.
REVERSED.
WRIGHT, J., participating on briefs.
MILLER-LERMAN, J., not participating.
GERRARD, J., concurring.
I agree completely with the court's main opinion. I write separately because of my concern regarding DHHS' communications with the Guatemalan consulate in this case. I agree with the court's conclusions that compliance with Neb.Rev.Stat. § 43-3801 et seq. (Cum. Supp. 2006 & Supp. 2007) is not jurisdictional and that DHHS' notification of the Guatemalan consulate minimally satisfied the Vienna Convention on Consular Relations (Vienna Convention).[1] That does not mean, however, that minimal compliance is the standard to which DHHS and the juvenile court should aspire.
It must be remembered that the foremost purpose and objective of proceedings under the Nebraska Juvenile Code[2] is the *97 protection and promotion of a juvenile's best interests.[3] The Legislature has recognized that early and active involvement of a foreign consulate is beneficial where the welfare of a foreign juvenile is concerned.[4] And the Vienna Convention represents the judgment of the United States, and 176 other governments,[5] that a consulate should be informed without delay when a guardian appears to be in the interests of a foreign minor.[6]
Which makes perfect sense. This case, for instance, might have proceeded far differently had Guatemalan consular officials been appropriately and actively engaged in the process from the beginning. The result in this casea rather startling departure from Maria's rights and the children's best interestsmight have been prevented. This case illustrates why DHHS, and the juvenile court, should not regard § 43-3801 et seq. and the obligations of the Vienna Convention as simply another legal hoop to jump through on the way to termination. Rather, the involvement of a foreign juvenile's consulate should be regarded as important to promoting the juvenile's best interests. The full participation of the consulate can help the juvenile and the juvenile's parents by ensuring that their interests are represented, and can also assist DHHS, the guardian ad litem, and the juvenile court by providing information and experience helpful to determining the juvenile's best interests.
In other words, the apparent miscommunication in this case should not have happened, because if DHHS notifies a foreign consulate of a pending proceeding and receives no reply, DHHS should try again. And if DHHS does not, then the guardian ad litem or the juvenile court should act to ensure that the consulate is notified and involved. The children whose interests are at issue in these proceedings deserve effective notice and, hopefully, participation of their consulates. DHHS' cursory compliance with what was apparently regarded as a legal technicality falls short of the effort that should be made to protect and promote a child's best interests.
HEAVICAN, C.J., and CONNOLLY and STEPHAN, JJ., join in this concurrence.
NOTES
[1] See Vienna Convention on Consular Relations, art. 37, Apr. 24, 1963, 21 U.S.T. 77, 102.
[2] In re Interest of Xavier H., 274 Neb. 331, 740 N.W.2d 13 (2007).
[3] In re Interest of Tyler F., 276 Neb. 527, 755 N.W.2d 360 (2008).
[4] Vienna Convention, supra note 1.
[5] See Johns v. Department of Justice of United States, 653 F.2d 884 (5th Cir.1981). See, also, Huynh Thi Anh v. Levi, 427 F.Supp. 1281 (D.C.Mich.1977).
[6] See Schleiffer v. Meyers, 644 F.2d 656 (7th Cir.1981), citing In re Burrus, 136 U.S. 586, 10 S.Ct. 850, 34 L.Ed. 500 (1890).
[7] In re Interest of M.B. and A.B., 239 Neb. 1028, 480 N.W.2d 160 (1992).
[8] In re Interest of Aaron D., 269 Neb. 249, 691 N.W.2d 164 (2005).
[9] Id.
[10] See In re Stephanie M., 7 Cal.4th 295, 27 Cal.Rptr.2d 595, 867 P.2d 706 (1994).
[11] Id.
[12] See, Breard v. Greene, 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998); E.R. v. Marion County Office of Family & Children, 729 N.E.2d 1052 (Ind.App.2000).
[13] See Arteaga v. Texas Dept. of Prot. and Reg. Services, 924 S.W.2d 756 (Tex.App. 1996).
[14] In re Interest of Tyler F., supra note 3.
[15] In re Interest of Anaya, 276 Neb. 825, 758 N.W.2d 10 (2008); In re Interest of Brian B. et al., 268 Neb. 870, 689 N.W.2d 184 (2004); § 43-247.
[16] In re Interest of Xavier H., supra note 2.
[17] Id.
[18] Id.
[19] See id.
[20] Id. at 348, 740 N.W.2d at 24-25, quoting Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
[21] See In re Interest of Xavier H., supra note 2.
[22] Id.
[23] Id. See In re Interest of Ty M. & Devon M., 265 Neb. 150, 655 N.W.2d 672 (2003).
[24] See In re Interest of Xavier H., supra note 2.
[25] Id.
[26] Id.
[27] In re Interest of Xavier H., supra note 2; In re Interest of Aaron D., supra note 8.
[28] In re Interest of Xavier H., supra note 2.
[29] Id. at 350-51, 740 N.W.2d at 26, quoting In re Guardianship of D.J., 268 Neb. 239, 682 N.W.2d 238 (2004).
[30] See In re Interest of Kassara M., 258 Neb. 90, 601 N.W.2d 917 (1999).
[31] Burke v. McKay, 268 Neb. 14, 679 N.W.2d 418 (2004).
[1] See Vienna Convention on Consular Relations, art. 37, Apr. 24, 1963, 21 U.S.T. 77, 102.
[2] Neb.Rev.Stat. § 43-245 et seq. (Reissue 2004, Cum. Supp. 2006 & Supp. 2007).
[3] See In re Interest of Corey P. et al., 269 Neb. 925, 697 N.W.2d 647 (2005).
[4] See § 43-3801.
[5] See Office of the Legal Advisor, U.S. State Dept., Treaties in Force 330-31 (Jan. 1, 2009).
[6] See Vienna Convention, supra note 1.