IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

IN RE INTEREST OF DAMIEN S.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF DAMIEN S., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,
V.
JERRY S., APPELLANT.

Filed October 22, 2013.    No. A-12-1209.

Appeal from the Separate Juvenile Court of Douglas County: ELIZABETH CRNKOVICH, Judge. Reversed and remanded for further proceedings.

Susanne M. Dempsey Cook , of Dempsey-Cook Law, for appellant.

Donald W. Kleine, Douglas County Attorney, Jennifer C. Clark, and Emily H. Anderson, Senior Certified Law Student, for appellee.

INBODY, Chief Judge, and IRWIN and RIEDMANN, Judges.

RIEDMANN, Judge.

## INTRODUCTION

Jerry S. appeals from the decision of the separate juvenile court of Douglas County terminating his parental rights to his son, Damien S. We reverse the termination of Jerry's parental rights because we do not find clear and convincing evidence that termination is in Damien's best interests.

## BACKGROUND

Jerry had three children with his ex-wife Jessica S. Jerry and Jessica had their parental rights to their two older children involuntarily terminated by the juvenile court in December 2010. At the time, Jessica was pregnant with Damien. This appeal involves only Jerry's parental rights to Damien.

- 1 -

In March 2011, Jerry assaulted Jessica and was arrested, charged with domestic violence, and subsequently incarcerated. Two months later, while Jerry was still incarcerated, Jessica gave birth to Damien. At that time, Jessica disclosed to the hospital that her rights had been terminated to her two older children. Jessica confided to an employee of the Department of Health and Human Services (DHHS) that at the time her rights to her two older children were terminated, she had been struggling. See *In re Interest of Damien S.*, 19 Neb. App. 917, 815 N.W.2d 648 (2012). She stated that she suffered from bipolar disorder, did not take medication, used marijuana regularly, and maintained a relationship with Jerry that involved extreme domestic violence. See *id*. The hospital responded to her disclosure by contacting DHHS, which then became involved in the case.

DHHS initially placed Damien with Jessica, but a few months later, the State filed a petition requesting that the juvenile court find Damien to be within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) and remove him from her care. Specifically, the State alleged that Damien was within the meaning of § 43-247(3)(a), because Jessica and her current boyfriend had engaged in domestic violence in his presence, Jerry engaged in domestic violence with Jessica while she was pregnant with Damien, and Jerry's rights to his two older children had been terminated. See *In re Interest of Damien S., supra*. The trial court held a detention hearing and determined that Damien should remain in the care of DHHS. *Id*. We affirmed that determination on appeal. *Id*. At some point, the State moved to terminate Jerry's parental rights, but the record does not contain the State's petition.

Jerry apparently had visitation at some point between the removal and February 2012, but the visitation was terminated when caseworkers realized it should not have been occurring due to a protection order issued against Jerry. The record does not contain a copy of the protection order nor does it provide details about it. The record also does not disclose any further details about the initial visitation. The record does show that Jerry contacted DHHS in July 2012 and that visitation resumed.

DHHS offered Jerry supervised visitation with Damien twice a week at Jerry's apartment. To qualify for this visitation, Jerry had to move from his original residence, because his roommate did not pass the background check.

In August 2012, Jerry asked for increased visitation, but DHHS denied his request, because of the relatively short amount of time he had had visits with Damien. In September and October, DHHS offered Jerry increased visitation but he did not have time in his schedule with his work, GED classes, Alcoholics Anonymous (AA) meetings, anger management classes, and parenting classes. In November, DHHS learned that Jerry had responded to a contact that Jessica initiated on "Facebook" and DHHS became concerned about that contact.

The State's motion to terminate Jerry's rights was tried in November 2012. At trial, the State presented testimony that Jerry's rights had been terminated to his two older children due to domestic violence and failure to participate in the offered services. With respect to the domestic violence, the evidence showed that although Jerry was sometimes the aggressor, at other times, Jessica initiated the violence. Since his release from incarceration, Jerry had not had any instances of domestic violence.

Damien's family permanency specialist testified that Jerry's rights should be terminated because of his recent "Facebook" contact with Jessica, because of his previous history, and

because he had shown progress for only a short time. She testified, "I don't think the amount of time that he has demonstrated his ability to parent has been sufficient. It's almost a too little, too late situation in my opinion." The family permanency specialist admitted, however, that Jerry had made several positive improvements: Jerry divorced Jessica, refrained from initiating contact with her, began taking GED classes, obtained a permanent address, consistently attended AA meetings, completed anger management classes, participated in a parenting group and other parenting classes, attended scheduled meetings, contacted her and made himself available, allowed her into his home, and had not missed a single visitation.

Jerry presented testimony from the worker who supervised his visitation with Damien and a parent-child coordinator who taught parenting classes. The parent-child coordinator testified that Jerry attended her classes, seemed interested in the material, and was very involved in her high participation classes. The visitation supervisor testified that Jerry's visits with Damien usually go well. She testified that when she arrives with Damien, Jerry greets him at the vehicle. She observed that if Damien is awake, he is smiling and excited to see Jerry. Jerry cheerfully gets Damien out of his car seat and takes him up to the apartment. If Damien is asleep when he arrives, Jerry will lay him on the couch and sit next to him while he sleeps. If Damien is awake, Jerry plays with Damien on the floor. If the visit occurs during mealtime, Jerry provides Damien with a meal. He provides Damien with diapers and wipes. If Damien is getting tired and has not had a nap, Jerry will rock him to sleep. If Damien needs discipline, Jerry provides appropriate and effective discipline. When the visit is almost over, Jerry will check Damien's diaper and change it if it needs changing. He will then put on Damien's coat, walk him to the car, buckle him in, talk to him a bit longer, tell him he loves him, give him a kiss, and stand at the curb until Damien and the worker drive away.

The juvenile court found clear and convincing evidence that Damien was within the meaning of Neb. Rev. Stat. § 43-292(2) (Cum. Supp. 2012) and that it was within Damien's best interests to terminate Jerry's parental rights. The trial court did not expand upon the reasons for its findings.

Jerry filed this timely appeal.

## ASSIGNMENT OF ERROR

On appeal, Jerry argues that the juvenile court erred in finding clear and convincing evidence that termination of his parental rights was in Damien's best interests.

## STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's finding. *In re Interest of Angelica L. & Daniel L.*, 277 Neb. 984, 767 N.W.2d 74 (2009).

## ANALYSIS

A court will terminate a parent's natural right to the custody of his child when the two requirements of § 43-292 have been met. See *In re Interest of Crystal C.*, 12 Neb. App. 458, 676 N.W.2d 378 (2004). First, there must be clear and convincing evidence of one of the conditions prescribed in subsections (1) through (10) of § 43-292, and second, there must be an additional

showing that termination of parental rights is in the child's best interests by clear and convincing evidence. See *In re Interest of Crystal C., supra*. Clear and convincing evidence produces in the trier of fact a firm belief about the existence of a fact to be proved. *In re Interest of Jagger L.*, 270 Neb. 828, 708 N.W.2d 802 (2006).

The trial court determined that the first requirement for termination was met because Damien was within the meaning of § 43-292(2). Section 43-292(1) allows a parent's rights to be terminated if "[t]he parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection." Because Jerry's rights to Damien's older siblings were terminated, Damien is within the meaning of § 43-292.

The trial court also determined that the second requirement for termination was met because termination was in Damien's best interests. In determining whether clear and convincing evidence shows termination is within Damien's best interests, the lower court can consider facts occurring within the time period before the filing of the termination action, as well as those that have transpired since. See *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). Relevant evidence of facts includes those relating to parental efforts and behavior, and the needs or circumstances of the child. *Id.*

One relevant fact is a parent's prior neglect of a juvenile's siblings. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010). Concluding that "'one's history as a parent speaks to one's future as a parent,'" the trial court in *In re Interest of Sir Messiah T. et al.* looked to a mother's history with the juvenile's siblings to determine that although the mother had made limited progress, terminating her rights was in the best interests of her children. 279 Neb. at 908, 782 N.W.2d at 328. The *In re Interest of Sir Messiah T. et al.* court noted, however, that while the mother had made limited progress, she continued to abuse alcohol and expose her children to domestic turmoil.

Although we recognize that "one's history as a parent speaks to one's future as a parent," we have previously determined that one's history does not alone determine his future. In a memorandum opinion filed on April 26, 2010, *In re Interest of Ray'Cine L.*, Nos. A-09-993 and A-09-994, this court declined to terminate a father's rights despite his history of exposing the children to domestic violence. In that case, although the father had not been entirely successful in protecting the children from domestic violence perpetrated by the mother, his positive steps prevented us from affirming the termination of his parental rights.

We have repeatedly cautioned that children cannot, and should not, be allowed to linger in foster care while waiting to see if the parent will mature. *In re Interest of Chloe C.*, 20 Neb. App. 787, 835 N.W.2d 758 (2013). At the same time, however, we must remember that the law does not require perfection of a parent. *Id.* Furthermore, we cannot turn a blind eye to the severe consequences of finally and completely severing a child from the parent. See *In re Interest of Crystal C.*, 12 Neb. App. 458, 676 N.W.2d 378 (2004). Because the consequences of termination are so severe, parental rights should be terminated only in "'the absence of any reasonable alternative and as the last resort.'" *Id.* at 465, 676 N.W.2d at 384 (quoting *In re Interest of Kantril P. & Chenelle P.*, 257 Neb. 450, 598 N.W.2d 729 (1999)). Accordingly, in determining whether termination is in a child's best interests, we assess whether the parent has made

continued improvement in parenting skills and whether a beneficial relationship has been established between the parent and child. *In re Interest of Chloe C., supra.*

The evidence in this case demonstrates that Jerry has continually improved his parenting skills and has established a beneficial relationship with Damien. Since his release from jail, Jerry has taken numerous steps to prove he is a capable father for Damien. After Jerry was released from jail, he pursued a relationship with Damien. After being prevented from seeing Damien due to a protection order, he took initiative and had visits re-established. He moved to an approved residence in order to have visitation with Damien in his home. During the visitation, Jerry demonstrated love, affection, and a strong interest in parenting. He also demonstrated that he could provide for Damien's needs and displayed an interest in helping Damien learn. To bolster his parenting skills, Jerry attended multiple parenting classes and participated fully.

At the same time, Jerry took substantial steps to improve his own life so that he could become a dependable caretaker for Damien. Jerry obtained a legal source of income, began GED classes, and attended AA meetings and anger management classes. While he declined increased visitation on two occasions, he did so because his schedule did not allow it. Jerry exercised judgment in determining that before increasing his parenting time, he first needed to attend more AA meetings.

Importantly, Jerry also realized that his relationship with Jessica bred problems, so he divorced her and did not initiate any contact with her. While the State presented evidence that Jerry had responded to contact Jessica initiated, the evidence of his one response to her is not sufficient to show he will fail to maintain the distance from Jessica that is necessary to prevent exposing Damien to domestic violence. This evidence shows that Jerry has made some mistakes as Damien's father. Jerry's commendable parenting progress, however, largely overshadows these mistakes. Jerry has demonstrated a clear capacity and desire to parent Damien. Upon our de novo review of the record, we conclude that there is insufficient evidence to prove that termination of Jerry's parental rights is in Damien's best interests.

## CONCLUSION

We find that the juvenile court erred when it found that the State had proved, by clear and convincing evidence, that terminating Jerry's parental rights would be in Damien's best interests. Accordingly, we reverse the judgment of the juvenile court and remand the cause for further proceedings.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.