# Wayne G., appellant, v. Jacqueline W., appellee.

___ N.W.2d ___

Filed December 17, 2013.     No. A-12-1037.

1. **Juvenile Courts: Appeal and Error.** Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings.

2. **Evidence: Appeal and Error.** When the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other.

3. **Parental Rights: Evidence: Proof.** For a juvenile court to terminate parental rights under Neb. Rev. Stat. § 43-292 (Cum. Supp. 2012), it must find that one or more of the statutory grounds listed in that section have been satisfied and that termination is in the child's best interests.

4. **Evidence: Words and Phrases.** Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proved.

5. **Parental Rights: Evidence: Appeal and Error.** If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in Neb. Rev. Stat. § 43-292 (Cum. Supp. 2012), the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground.

6. **Parental Rights.** One need not have physical possession of a child to demonstrate the existence of the neglect contemplated by Neb. Rev. Stat. § 43-292(2) (Cum. Supp. 2012).

7. **Parental Rights: Proof.** In addition to proving a statutory ground for termination of parental rights, the State must show that termination is in the best interests of the child.

8. **Constitutional Law: Parental Rights: Proof.** A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit.

9. **Parental Rights: Presumptions: Proof.** There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit.

10. **Parental Rights: Words and Phrases.** Although the term "unfitness" is not expressly used in Neb. Rev. Stat. § 43-292 (Cum. Supp. 2012), the concept is generally encompassed by the fault and neglect subsections of that statute and through a determination of the child's best interests.

11. ____: ____. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being.

12. **Parental Rights.** The best interests analysis and the parental fitness analysis are fact-intensive inquiries, and although they are separate inquiries, each examines essentially the same underlying facts as the other.

13. ____. The best interests of a child require termination of parental rights when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time.

14. ____. Children cannot, and should not, be made to await uncertain parental maturity.

Appeal from the County Court for Seward County: Gerald E. Rouse, Judge. Affirmed.

Jerrod P. Jaeger, of Jaeger Law Office, P.C., L.L.O., for appellant.

Eric J. Williams for appellee.

Gregory C. Damman, of Blevens & Damman, guardian ad litem.

Inbody, Chief Judge, and Irwin and Riedmann, Judges.

Inbody, Chief Judge.

## INTRODUCTION

This case is different from the typical juvenile case we review on appeal, insomuch as the petition to terminate parental rights was brought by the minor child's mother, without participation by the State. The biological father, Wayne G., appeals the order of the Seward County Court, sitting as a juvenile court, terminating his parental rights to the minor child, Jaidyn G. For the reasons that follow, we affirm the order of the court.

## STATEMENT OF FACTS

On September 27, 2011, Wayne filed a complaint in Seward County District Court to acknowledge paternity and to establish custody and parenting time. The complaint alleges that Wayne and Jacqueline W. were in a relationship while the two lived in California, but never married, and that the relationship resulted in the birth of Jaidyn in 2006, which occurred while Jacqueline was married to another man. Jacqueline filed an answer in which she alleged, among other things, that Wayne was not a fit person to have custody and that

he was barred from contact with Jaidyn as a result of a protection order that had been granted by the Seward County District Court.

On February 27, 2012, Jacqueline filed an amended petition in Seward County District Court to terminate Wayne's parental rights to Jaidyn pursuant to Neb. Rev. Stat. § 42-364(5) (Cum. Supp. 2012). The amended petition alleged that Wayne and Jacqueline are the biological parents of Jaidyn. The petition alleged that grounds for termination of Wayne's parental rights existed pursuant to Neb. Rev. Stat. § 43-292 (Cum. Supp. 2012) and that termination was in Jaidyn's best interests. In April, the case was transferred to the county court for further proceedings on Jacqueline's amended petition to terminate Wayne's parental rights.

Trial was held on the amended petition to terminate Wayne's parental rights. Chantique H., Wayne's biological daughter, who at the time of trial was 24 years old, testified that she has a younger sister who is also Wayne's biological child. Chantique testified that Wayne's parental rights to her and her sister were terminated in California 8 years prior to the trial regarding Jaidyn, when Chantique was 16 years old. Chantique testified that the issues involved in that termination case involved multiple arrests, drug addiction, child abuse, anger and violence, and neglect. Chantique testified that she had witnessed Wayne and her mother smoking crack cocaine in their home. Chantique testified that when she was younger, on numerous occasions, she witnessed Wayne severely beat her mother and that he was very violent in their home. Chantique testified Wayne would hit, strangle, kick, and throw her mother. Chantique testified that Wayne had admitted to her that he suffered from a mental illness, and had showed her medical records indicating that he had been diagnosed with bipolar disorder and severe depression. Chantique testified she believed that Wayne had never taken responsibility for his actions in the termination of parental rights case regarding her and her sister and that he had continually blamed everyone else involved for his rights being terminated. Chantique testified that it was "a very traumatizing experience" having Wayne as a father.

Jacqueline testified that she had filed for the termination of Wayne's parental rights to Jaidyn. Jacqueline testified that she had three children besides Jaidyn, from a previous marriage. Jacqueline testified that around 2001 or 2002, she met Wayne in California while she had been separated from her first husband. Jacqueline was living at a motel when she met Wayne, and thereafter their relationship progressed quickly. After just a few months, Jacqueline and Wayne moved in together and Jacqueline began to see that Wayne had problems with drugs. Jacqueline testified that Wayne used crack cocaine in her apartment, where she was living with her three children. Jacqueline attempted to confront Wayne, and he told her that he needed the drugs to take care of his attention deficit hyperactivity disorder. Jacqueline testified that during the time she and Wayne lived together, she smoked marijuana, but did not ever use crack cocaine. Jacqueline testified that she and Wayne resided together for 3½ years, during which time Wayne attempted inpatient drug treatment and was incarcerated on several occasions. Jacqueline also testified that domestic violence had occurred during their relationship and that Wayne had been arrested for that violence. Jacqueline testified that throughout their relationship, Wayne pushed and shoved her, threatened her, and isolated her from outside contact, in addition to physically and mentally abusing her three children. Jacqueline testified that Wayne subjected her sons to emotional and physical abuse, calling one of her sons a "fat pig" and beating him with a paint stick and beating her other son with a wooden cane. Wayne threatened to hunt Jacqueline and her children down and harm them if she tried to leave him.

In 2005, Jacqueline became pregnant with Jaidyn, but Jacqueline testified that Wayne did not change his behavior and continued to engage in physical abuse with her and the children. The night Jacqueline came home from the hospital after giving birth to Jaidyn, Wayne continually yelled at her and forced her to clean the house. The next day, Wayne forced Jacqueline to return to work. When Jaidyn was very young, Wayne came home after taking drugs and did not see Jaidyn on the bed and sat on her. Jacqueline testified that in 2006,

shortly after Wayne had sat on Jaidyn, she left California with Jaidyn and her other children, because she could no longer handle Wayne's drug use and she feared more abuse and control of both her and her children. Jacqueline testified that Wayne removed wires from the engine in her car to prevent her from leaving. Wayne's father helped Jacqueline get a car to leave California, in addition to finding her a trailer to load with a few items for the children and providing her with money.

Jacqueline testified that she filed for a protection order against Wayne in Nebraska, after he left messages on her voice mail threatening her and the children. Jacqueline testified that she tried to make a relationship between Wayne and Jaidyn work by facilitating telephone calls and allowing him to come to Nebraska for a visit during Easter in 2009. Jacqueline testified that she had originally wanted to move back to California, but explained that she would move back only if Wayne could remain sober and free from drugs, but that he had repeatedly failed in his attempts to stop using drugs.

Jacqueline testified that she has remarried and that Jaidyn refers to Jacqueline's new husband as her "daddy." He is involved in Jaidyn's life and would like to adopt Jaidyn if Wayne's parental rights are terminated.

Jacqueline's sister testified that she first met Wayne in 2006, while he was incarcerated and while Jacqueline was pregnant with Jaidyn. Jacqueline's sister also stayed with Jacqueline at other times during the relationship and observed Wayne push and hit Jacqueline in the face on several occasions, both while Jacqueline was pregnant and after Jaidyn had been born. Jacqueline's sister testified that Wayne was "mean" and always angry, which made her feel threatened when she would stay with Jacqueline. On several occasions, Jacqueline asked her sister not to leave and Wayne would be gone for days at a time. Jacqueline's sister witnessed Wayne sit on Jaidyn when she was young and also witnessed Wayne forcing Jacqueline, just days after giving birth, to go outside and work for him, even though she had been ordered to have bed rest because her incisions from giving birth were not healing properly. Jacqueline's sister explained that Wayne called

Jacqueline names and would not allow Jacqueline to nurse Jaidyn because he felt she needed to be working instead. Jacqueline's sister also testified that Wayne had left her threatening voice mails which indicated that he was going to "gut me and hang me from my third floor balcony by my feet for the world to see because I wouldn't pick up my phone and tell him where [Jacqueline] was."

Jacqueline's daughter from her first marriage testified that she met Wayne in 2002, when she was 17 years old, before Jacqueline knew him. The daughter testified that after she had observed Wayne smoking crack cocaine on one occasion, he instructed her to not tell Jacqueline, because he was just going through a "quick relapse" and would not be smoking crack cocaine anymore. Jacqueline's daughter testified that Wayne spent at least half of the duration of his relationship with Jacqueline incarcerated for 6 to 8 months at a time. The daughter testified that Wayne was very violent and was physically and emotionally abusive. She specifically testified that she witnessed Wayne hit her brothers and Jacqueline with his hands and other objects. She testified that on one occasion, he grabbed her by the neck and pushed her against the wall. Wayne would tell her that she was worthless and lazy and, when she turned 18 years old, told her she was not welcome in their home any longer. Jacqueline's daughter also testified that Wayne threatened to drug her with heroin, take her to Mexico to use as a prostitute until he felt that she had "suffered enough," and then kill her himself.

Wayne testified that he was Jaidyn's biological father and that he was fit to be a father for Jaidyn. Wayne testified that he was "getting [his] chemical situation straightened out" and that he could be a positive influence upon Jaidyn's life. Wayne testified that when Jacqueline left California with Jaidyn, he was in no condition to be around her or the children, and that he did not blame her for moving to Nebraska, but that in the past 3 years, he had turned his life around and had not used cocaine in 2 years. However, later in Wayne's testimony, he indicated that earlier in 2012, he had been arrested and charged in California with attempted possession of a controlled substance. Wayne explained that he had been dropping

off one of his employees, when police officers were executing a "parole, probation sweep." Wayne testified that he was taken away by the police because he was a parolee in a gang/drug neighborhood and had a prior possession conviction. Wayne testified that he had been on probation in California and had it revoked, which meant that he would most likely not be put on probation for the pending charge. Wayne explained that he was offered a deal with the State of California for a 7-year prison sentence but was going to fight the charge.

Wayne testified that he had been prescribed psychotropic drugs for attention deficit hyperactivity disorder and that Narcotics Anonymous did not "apply to" him, because once he was "properly medicated," there was no need to self-medicate with cocaine to calm himself. Wayne testified that he is under the care of a psychiatrist and a psychologist and also takes legally prescribed medications for posttraumatic stress disorder and depression. Wayne also indicated that his business is now successful, he has a relationship with a "wonderful woman," and he has a home. Wayne testified that he had not been battling a drug addiction for the past 25 years, but really had been battling a "chemical issue" and that once the chemical issue had been addressed, everything else had been taken care of. Wayne testified that since 2006, he had received substance abuse treatment on one occasion, in 2008, after being released from prison for conspiracy to commit burglary and robbery.

Wayne testified that he had never been able to successfully raise a child and that he has had his parental rights terminated as to two other children in California. He testified, however, that one of those children was actually in a guardianship because of her age and that he had not lost his parental rights to her. Wayne testified that during those proceedings, he was incarcerated for domestic violence. Wayne testified that he had a criminal history which included, but was not limited to, several convictions related to drug possession. Wayne also testified that he had one felony conviction for domestic violence and one misdemeanor for verbal domestic violence. Wayne testified that he had an anger problem, but was never violent with children. Wayne explained that his ex-wife

had had a drug problem, that he had once grabbed her by the hair and dragged her into their home, and that their relationship had been volatile. Wayne also testified that he has been involved in several types of protection or harassment order proceedings which were filed against him and also a case involving elder abuse.

Wayne testified that he had been unable to leave California due to the terms of his parole and had seen Jaidyn only three times since Jacqueline and Jaidyn moved to Nebraska in 2006. Wayne testified that in 2009, he came to Nebraska for 3 or 4 days to see Jacqueline and Jaidyn because he wanted to reconcile with Jacqueline. Wayne testified that since then, he has sent letters to both Jacqueline and Jaidyn. Wayne also testified to giving Jacqueline $300 in September 2009, but that may have been money to pay Jacqueline back for financing his trip to Nebraska earlier in the year. Wayne estimated that he had given Jacqueline "maybe" $1,000 for Jaidyn since Jaidyn had been born. Wayne testified that all he wanted was to be able to communicate with Jaidyn, to be able to send her packages and letters, and to be able to have one visit a year with her when Jacqueline came to California.

Wayne's girlfriend testified that she has been in a romantic relationship with Wayne over the past year and that she currently lives with Wayne and her 19-year-old son in California. She testified that she met Wayne while visiting a friend at a recovery facility. She testified that she was familiar with his history and mental issues, and that over the past year, Wayne has consistently maintained his prescribed medications. She testified that she had witnessed Wayne with minors and that he acted appropriately and was helpful with children in her family. She testified that Wayne had not used any illegal drugs since she had known him, had not been in possession of illegal drugs, and had not been physically or emotionally abusive toward her or her family. She testified that Wayne spoke often of Jaidyn and was always buying Jaidyn gifts. She also testified that Wayne was not an unfit parent.

On October 3, 2012, the trial court entered an order on Jacqueline's amended petition for termination of Wayne's parental rights. The court found that clear and convincing

evidence had been presented that termination was proper pursuant to § 43-292(2), (4), (5), and (9), and also that termination was in Jaidyn's best interests due to the "substantial evidence including but not limited to the prior terminations of [Wayne's] parental rights to two prior biological children, [Wayne's] habitual use of crack cocaine, and the violent actions of [Wayne] in the home." It is from this order that Wayne has now timely appealed to this court.

## ASSIGNMENTS OF ERROR

Wayne assigns that the trial court erred in determining that termination was warranted pursuant to § 43-292 and was also in the best interests of Jaidyn.

## STANDARD OF REVIEW

[1,2] Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Angelica L. & Daniel L.*, 277 Neb. 984, 767 N.W.2d 74 (2009). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *Id.*

## ANALYSIS

*Statutory Grounds.*

The juvenile court terminated Wayne's parental rights under § 43-292(2), (4), (5), and (9). In his brief, Wayne admits that "[s]ubsections (2), (4), and (9) were supported by significant evidence of drug use, domestic abuse, and criminal behavior," but that that evidence extended only until 2006, with none to support those allegations thereafter. Brief for appellant at 21.

[3,4] For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in that section have been satisfied and that termination is in the child's best interests. See *In re Interest of Jagger L.*, 270 Neb. 828, 708 N.W.2d 802 (2006). The State must prove these facts by clear and convincing evidence. *Id.* Clear and convincing evidence is that amount of evidence

which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proved. *Id*.

[5] If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Justin H. et al.*, 18 Neb. App. 718, 791 N.W.2d 765 (2010).

As mentioned previously, this case differs from those that normally come on appeal before this court, because the petition to terminate parental rights was filed pursuant to § 42-364(5) by the other biological parent, not the State; nonetheless, we conclude that Jacqueline proved by clear and convincing evidence that termination was warranted.

Under § 43-292(2), grounds for termination exist when the parent has "substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection." The record in this case shows that Wayne has habitually abused narcotic drugs for the past 25 years, which has resulted in repeated arrests and convictions related to that drug abuse, the most recent of which was in May 2012. Wayne repeatedly testified that his involvement with illegal drugs was not his fault, but instead the result of his "chemical problems" and mental illnesses. The record indicates that Wayne has spent a significant amount of time incarcerated and, since Jaidyn was born in 2006, has spent very little time with Jaidyn.

The record is replete with testimony regarding Wayne's significantly violent anger problem, which has resulted in an alarming history of violent abuse in nearly all of his relationships, from his numerous romantic relationships with women, to elder abuse, and to violent abuse against children, both his own and Jacqueline's. Wayne's first two biological children realized the wrath of his violence and drug abuse which resulted in the termination of his parental rights. The record also reveals that Wayne has had numerous protection orders filed against him by various women and that one of those included Jacqueline and Jaidyn as a result of his repeated

threats to end Jacqueline and her children's lives. The record reveals that Jacqueline fled California in fear of both her and Jaidyn's lives and moved to Nebraska, where the two have remained. Even though Jacqueline was in such fear, she continued on various occasions to try to work things out with Wayne, including paying for him to visit Nebraska in 2009, which visit lasted only 3 or 4 days, with Wayne himself admitting that he spent little time with Jaidyn.

[6] Wayne argues that Jacqueline proved only one instance of neglect—when he sat on Jaidyn when she was very young— and that that alone is not enough to show substantial and continuous neglect. However, one need not have physical possession of a child to demonstrate the existence of the neglect contemplated by § 43-292(2). *In re Interest of Kalie W.*, 258 Neb. 46, 601 N.W.2d 753 (1999). Most of Jaidyn's life, Wayne has been unable to visit her because of incarceration due to his own actions and then conditions of his parole, including that he not leave California—parole which was the direct result of Wayne's continued choice to engage in illegal and violent criminal actions. As set forth above, Wayne's most recent criminal arrest was in May 2012, and although Wayne testified that he was going to fight that charge, Wayne admitted that due to his criminal history, if found guilty, he would most likely again be incarcerated.

Wayne testified that he has attempted to send a few packages to Jaidyn and estimated that he had given Jacqueline only around $1,000 over the course of Jaidyn's life, some of which was to actually repay Jacqueline for money he had borrowed and not for Jaidyn's support. Further, although Wayne testified that he was fit to parent Jaidyn, he admitted that he was not ready to parent and did not want more than to be able to talk with Jaidyn on the telephone and to have one visit per year with her.

Based upon our review of the record, there is sufficient evidence in the record to support a finding that termination under § 43-292(2) was proper, and the juvenile court did not err in making this finding. Because we have found that termination was proper under § 43-292(2), we need not consider Wayne's arguments as to the remaining grounds for termination.

*Best Interests.*

Wayne argues that he has taken substantial steps to correct the problems that existed when Jacqueline fled with Jaidyn to Nebraska and that, as such, termination is not in Jaidyn's best interests. Specifically, Wayne relies on the testimony of his girlfriend that he is appropriately medicating his mental disease and now treats both adults and children appropriately.

[7-12] In addition to proving a statutory ground for termination of parental rights, the State must show that termination is in the best interests of the child. See, *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012); *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Kendra M. et al., supra.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly used in § 43-292, the concept is generally encompassed by the fault and neglect subsections of that statute and through a determination of the child's best interests. See *In re Interest of Kendra M. et al., supra.* In the context of the constitutionally protected relationship between a parent and a child, the Nebraska Supreme Court has stated, ""'Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being."'" *Id.* at 1033-34, 814 N.W.2d at 761, quoting *Uhing v. Uhing*, 241 Neb. 368, 488 N.W.2d 366 (1992). The best interests analysis and the parental fitness analysis are fact-intensive inquiries, and although they are separate inquiries, each examines essentially the same underlying facts as the other. See *In re Interest of Kendra M. et al., supra.*

The record does indicate that, from the testimony of both Wayne and his girlfriend, Wayne is attempting to change his

past behaviors over the past year by regularly taking his medication and seeking help from a counselor. However, Wayne's testimony indicates that he has accepted little responsibility for his past actions. He testified that he acted inappropriately, but maintains that he does not have a drug problem and that he did not abuse children or treat women poorly. Throughout his testimony, he downplayed or entirely dismissed the testimony given that he was very violent with women; with his own children, to which his parental rights were terminated; with Jacqueline's other children; and also with an elderly woman whom he claims he was caring for. Witnesses recounted Wayne's severe physical and mental abuse, which continued with Jacqueline even after she moved to Nebraska, through numerous recorded telephone messages where he very frequently threatened to kill both her and her children. Furthermore, even though Wayne testified that he has turned his criminal tendencies around, in May 2012, he was arrested for attempted possession of a controlled substance, which he testified was not his fault. Clearly, based upon this record, it is not in Jaidyn's best interests to force her, after 6 years of little or no contact with Wayne, into a relationship with a man who has shown extremely dangerous behavior and who continues to make choices that result in incarceration which further prevents him from being available to be in Jaidyn's life.

[13,14] The best interests of a child require termination of parental rights when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time. See *In re Interest of Emerald C. et al.*, 19 Neb. App. 608, 810 N.W.2d 750 (2012). Children cannot, and should not, be made to await uncertain parental maturity. See *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008). To hold Jaidyn's life at a standstill for Wayne, with the hope that a positive relationship might develop at an unknown time in the future, is not in Jaidyn's best interests. Furthermore, the record contains evidence that Jaidyn has bonded with Jacqueline's new husband, who testified that he intends to adopt Jaidyn. Therefore, we conclude that Wayne is an unfit parent and that termination of Wayne's parental rights is in Jaidyn's best interests, and we affirm the order of the juvenile court finding the same.

CONCLUSION

Upon our de novo review of the record, we find that the evidence presented was sufficient to warrant termination of Wayne's parental rights to Jaidyn and that termination is in Jaidyn's best interests. Therefore, we affirm.

Affirmed.

——————————

State Farm Fire & Casualty Company, appellee, v.
Jerry Dantzler, appellant, and David Chuol,
individually and as father and next friend
to Chuol Geit, and Chuol Geit, appellees.

___ N.W.2d ___

Filed December 17, 2013.    No. A-12-1042.

1. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.

2. ____: ____. In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence.

3. **Contracts: Appeal and Error.** The construction of a contract is a matter of law, and an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determinations made by the court below.

4. **Insurance: Contracts.** A pollution exclusion is unambiguous when it bars coverage for injuries caused by all pollutants, not just traditional environmental pollution.

Appeal from the District Court for Douglas County: Kimberly Miller Pankonin, Judge. Reversed and remanded for further proceedings.

Michael A. Nelsen, of Marks, Clare & Richards, L.L.C., for appellant.

David J. Stubstad and Patrick S. Cooper, of Fraser Stryker, P.C., L.L.O., for appellee State Farm Fire & Casualty Company.