IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

IN RE INTEREST OF LORENZO S. & LILLIAN S.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF LORENZO S. AND LILLIAN S.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,
V.
ELIZABETH S., APPELLANT.

Filed June 3, 2014.    Nos. A-13-513 and A-13-516.

Appeal from the County Court for Scotts Bluff County: KRISTEN D. MICKEY, Judge.
Affirmed.

David S. MacDonald, Deputy Scotts Bluff County Public Defender, for appellant.

Doug Warner, Scotts Bluff County Attorney, for appellee.

Lindsay R. Snyder, of Smith, Snyder & Petitt, G.P., guardian ad litem.

MOORE, PIRTLE, and RIEDMANN, Judges.

PIRTLE, Judge.

## INTRODUCTION

Elizabeth S. appeals from the order of the county court for Scotts Bluff County, sitting as a juvenile court, which terminated her parental rights to her minor children, Lorenzo S. and Lillian S. On appeal, Elizabeth challenges the district court's finding that termination was in the children's best interests and asserts she was denied due process of law. For the reasons that follow, we affirm.

## BACKGROUND

Elizabeth appeals the termination of her parental rights to twins, Lorenzo and Lillian, born in January 2011. In August 2011, two calls were made to the neglect intake hotline

- 1 -

reporting that Elizabeth was abusing controlled substances, not taking her mental health medication, and not properly caring for the children. Karol Garduño, of the Nebraska Department of Health and Human Services (DHHS), contacted Elizabeth to establish whether there was a factual basis for the allegations. At that time, Elizabeth admitted that she had used methamphetamine. An examination of the children did not reveal bruises or other marks indicating they had been handled roughly. Elizabeth submitted to a urinalysis screening and tested positive for methamphetamine and amphetamine. Garduño asked Elizabeth if she had someone she could call to stay with the children, and Elizabeth's paternal grandmother picked up the children and took them to her home.

Elizabeth indicated that she would be willing to work with DHHS on a voluntary basis until DHHS could determine how to proceed. Elizabeth was informed that DHHS would likely request to file a petition with the county attorney's office.

Elizabeth and the children stayed briefly with her grandmother, and after a few days, Elizabeth called her aunt, Georgina M. (Gina), and asked Gina to take the children for the weekend to give Elizabeth a break. During that time, Elizabeth got into an argument with a family member at her grandmother's home. Elizabeth's grandmother asked that the children be placed elsewhere, because she did not want Elizabeth in her home. On August 22, 2011, the children had a positive hair follicle test for methamphetamine ingestion. The children were placed with Gina and her husband, with Elizabeth's consent. The children were placed in the home of Gina and her husband at all times relevant to this case from that date forward.

On January 6, 2012, the State of Nebraska filed separate juvenile petitions under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) alleging that each child lacked proper parental care due to Elizabeth's history of drug abuse and her inability to properly care for each child as the result of her drug use. Identical filings were made for both Lorenzo and Lillian, and the cases progressed together. Motions for temporary custody were filed, supported by an affidavit from a children and family service specialist. The children were placed in the temporary custody of DHHS. Amended petitions were filed on January 10, stating that the children were under the provisions of the Indian Child Welfare Act (ICWA), and ICWA notices addressed to the Oglala Sioux Tribe were filed with the court on January 12.

On February 14, 2012, Elizabeth pled no contest to the amended allegations of having a history of using methamphetamine, testing positive for methamphetamine, and being unable to maintain sobriety. A second amended petition was filed in each case on February 15, amending the documents to reflect the allegations Elizabeth pled to.

A dispositional hearing was held on March 27, 2012; the court adopted the case plan offered by DHHS; and placement with DHHS was continued. At a review hearing on June 26, the court ordered the case plan to continue, with a permanency objective of reunification by September 26. At a permanency hearing on September 27, the permanency goal of adoption was established, with an alternate concurrent goal of reunification. This change was recommended by DHHS and the children's guardian ad litem. Motions to terminate Elizabeth's parental rights were filed on December 7. The motions alleged that statutory grounds existed for termination of Elizabeth's parental rights under Neb. Rev. Stat. § 43-292(2), (4), (6), and (7) (Cum. Supp. 2012) and that termination was in the children's best interests. The motions stated that the juveniles were of Native American heritage and were or may have been eligible for enrollment with the

Oglala Sioux Tribe and that therefore, notification of the proceedings to the tribe was necessary. The motions alleged, pursuant to Neb. Rev. Stat. § 43-1505(4) (Reissue 2010), that termination was appropriate because active efforts had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that those efforts had proved to be unsuccessful. The motions also alleged, pursuant to § 43-1505(6), that termination was appropriate because continued custody of the minor children by the parents was likely to result in serious emotional or physical damage to the children.

Elizabeth filed a motion to disqualify the county attorney's office from further participation in the proceedings on January 22, 2013. Elizabeth asserted there was a conflict of interest in this case because Gina, Elizabeth's aunt, is also an employee of the county attorney's office in the child support department. Elizabeth requested that a special prosecutor be appointed or that the cases be dismissed. Gina testified about her involvement in the case. The court found there was not sufficient evidence to find a conflict of interest or bias and overruled the motion.

Elizabeth attempted several treatment programs during the pendency of this case. She began attending drug and alcohol education and prevention classes on a regular basis in August or September 2011. She also attempted inpatient treatment on three separate occasions, but did not successfully complete any of the programs.

Elizabeth attended NEPSAC in Gordon, Nebraska, starting November 30, 2011, for approximately 3 weeks, but she did not complete the treatment cycle. Elizabeth told the education coordinator for McConaughy Discovery Center that she felt she was being discriminated against, and she decided to leave. She relapsed and had a positive drug test in January 2012. Elizabeth began a dual diagnosis treatment program at St. Monica's in Lincoln, Nebraska, in March. The plan was to finish 30 days and to enroll in the optional "Project Mother Child" program, which would have allowed Lorenzo and Lillian to accompany Elizabeth during her treatment. Elizabeth did not complete the first 30 days and was released from St. Monica's for noncompliance in April. Elizabeth was accepted to NOVA, an inpatient, dual diagnosis longer term treatment center in Omaha, Nebraska, in August. Elizabeth was admitted on August 22, and she left the treatment center on August 25. Elizabeth was in a homeless shelter in Omaha on August 26 and stayed there approximately 3 weeks before returning to Scottsbluff, Nebraska. Elizabeth worked with an addiction counselor, but did not continue to see her regularly, and Elizabeth stopped scheduling appointments.

Elizabeth regularly tested positive for amphetamine and methamphetamine when urinalysis screenings were performed. She also regularly refused testing, and instead, she elected to sign an admission that she had used controlled substances.

Elizabeth has not maintained a stable residence for the children to return to. She lived in seven or more residences during the pendency of this case, excluding treatment facilities. Elizabeth did not maintain employment during the case. Elizabeth did not provide for the basic needs of the children during the case, including providing food, clothing, shelter, or any other basic amenities.

Supervised visitation was available to Elizabeth throughout this case, and Elizabeth was not eligible for unsupervised visits at any time. Several support workers testified that when visits actually occurred, Elizabeth was prepared and interacted well with the children. However, visitation during the case was sporadic at times or did not occur at all. During some periods,

Elizabeth attended only a fraction of her visits and they did not last the allotted time. In April 2012, 10 visits were scheduled--Elizabeth attended 2 and canceled 8. In May, 23 visits were scheduled--Elizabeth attended 10 and canceled 13. In June, 16 visits were scheduled--Elizabeth attended 7 and canceled 9. Between June 11 and August 22, 13 visits were canceled and 17 visits occurred--of the 17 visits, only 2 visits lasted the full 5-hour period.

The contested adjudication on the motions to terminate parental rights was before the Scotts Bluff County Court on March 5, 2013.

Shaylee Jobman, a children and family service specialist for DHHS, testified that Elizabeth did not progress to a point where she could be reunified with the children. She stated that it was her opinion that Lorenzo and Lillian needed permanency and it was in their best interests to be adopted.

Desiree Montgomery, a children and family service specialist for DHHS, testified that Elizabeth made no progress in addressing the underlying issue in this case, her substance abuse. There is no evidence that Elizabeth attended Alcoholics Anonymous or Narcotics Anonymous meetings and she did not consistently work to maintain her sobriety after leaving inpatient treatment centers. Montgomery stated that Elizabeth did not demonstrate an ability to provide income, housing, food, or clothing for the children. She stated her opinion that it was in the best interests of Lorenzo and Lillian to remain in out-of-home placement with the goal of adoption.

Kylie Wilson, a children and family service specialist for DHHS, testified that she began working with Elizabeth in October 2012. She testified that during that time, the primary goal was adoption, but Elizabeth was still receiving services, including supervised visitation, drug screening, and transport, and she had access to counseling services. Wilson testified that the children were not placed with Elizabeth and that Elizabeth was not prepared to provide for the basic necessities and needs of the children. Wilson stated her opinion that the best interests of the minor children required termination of Elizabeth's parental rights.

Jessica Reffalt-Herrera testified that she was the education coordinator for McConaughy Discovery Center when she began working with Elizabeth. Elizabeth told Reffalt-Herrera that she was using substances daily, and her use was described as habitual. Reffalt-Herrera testified that Elizabeth did not progress to a point where she would have been able to provide for the necessities and care of the children.

Elizabeth testified that she became enrolled with the Oglala Sioux Tribe. Cassandra Whipple-Benitez, an ICWA expert and a member of a division of the Oglala Sioux Tribe, testified that the tribe holds children in extremely high regard. She stated that from a tribal perspective, it is not acceptable for children to live in a home where continuous substance abuse is occurring. She testified that it was unclear whether Lorenzo and Lillian were eligible for enrollment in the tribe, but that Gina and her husband were incorporating cultural plans and that the appropriate steps had been taken to comply with ICWA, if the law applies. Whipple-Benitez testified that Elizabeth received numerous services throughout the case, including monthly out-of-home maintenance payments for the children, Nebraska Medicaid for the children, supervised visitation, family support services, family team meetings, monthly contact with the children and the foster placement, pretreatment assessments, respite care, substance abuse treatment, transportation to visits and to treatment centers, clothing vouchers, gas vouchers,

childcare payments, parenting skills courses, drug screenings, grocery and meal vouchers, vouchers for household items, and addiction counseling.

At trial, Elizabeth testified that she has had a difficult time since the children were removed and that she has continued to use controlled substances. She testified that she used methamphetamine on a daily basis, including the morning of the trial, and that she was under the influence of methamphetamine in court that day. She stated that her drug use did not have an effect on her ability to parent the children, but she knew that it was "bad" and that her use impacted the children's lives.

On April 19, 2013, the court issued a written order finding the State proved by clear and convincing evidence that the statutory grounds for termination under § 43-292(1), (2), (4), (6), and (7) existed. The court also found that the testimony of Whipple-Benitez was credible and that the State provided active efforts as required under ICWA. The court found, beyond a reasonable doubt, that the children face a substantial likelihood of serious emotional or physical abuse within the near future if they were to be placed in the care of Elizabeth. See § 43-1505(6). The court found the State proved by clear and convincing evidence that termination of Elizabeth's parental rights was in the best interests of the children. Elizabeth timely appealed.

## ASSIGNMENTS OF ERROR

Elizabeth asserts the trial court erred by finding, by clear and convincing evidence, that termination of her parental rights was in the best interests of the minor children. She also asserts she was denied due process of law.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Angelica L. & Daniel L.*, 277 Neb. 984, 767 N.W.2d 74 (2009). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *Id.*

## ANALYSIS

For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in that section have been satisfied and that termination is in the child's best interests. See *In re Interest of Jagger L.*, 270 Neb. 828, 708 N.W.2d 802 (2006). The State must prove these facts by clear and convincing evidence. *Id.* Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proved. *Id.*

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

Here, the court found the State proved by clear and convincing evidence that the statutory grounds for termination existed under § 43-292(1), (2), (4), (6), and (7). Elizabeth does not contest the court's finding that grounds for terminating her parental rights exist. After reviewing

the record, we find that one or more of the grounds for termination did exist. Section 43-292(4) provides for termination of parental rights when "[t]he parents are unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct is found by the court to be seriously detrimental to the health, morals, or well-being of the juvenile."

Elizabeth voluntarily placed Lorenzo and Lillian with family members, Gina and her husband, in August 2011. Elizabeth was not in a position to care for the children on a full-time basis at any time prior to the termination proceedings in March 2013. Elizabeth's drug dependency and her unsuccessful attempts to complete drug treatment programs are well documented in the record. Elizabeth's continued drug use was evident as she attended visits with her children, and arrived at trial, under the influence of illegal drugs. Her substance use has prevented her from contributing to the care and well-being of her children on a regular basis. Our de novo review of the record clearly and convincingly shows that grounds for termination of Elizabeth's parental rights under § 43-292(4) were proved by sufficient evidence. Once a statutory basis for termination has been proved, the next inquiry is whether termination is in the child's best interests.

With respect to the best interests of a juvenile in termination of parental rights proceedings, the Nebraska Supreme Court has stated that the law does not require perfection of a parent. Rather, we should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Skye W. & McKenzie W.*, 14 Neb. App. 74, 704 N.W.2d 1 (2005).

Elizabeth asserts the record does not contain sufficient evidence to establish that termination of her parental rights was in the children's best interests. She asserts that "had she been given an opportunity and time to effectively deal with her substance abuse problems she would have been able to effectively use her parenting skills to properly raise these children." Brief for appellant at 10-11.

However, the record shows that Elizabeth has not made sufficient progress during the pendency of this case to allow the children to return to a safe, stable environment. She has been unable or unwilling to obtain employment, has not obtained permanent housing, and has not demonstrated that she is prepared to provide the necessities for the care of the children in the future. The evidence shows that she has made attempts to overcome her substance abuse and dependence on methamphetamine, but that she has not been successful. She tried three separate inpatient treatment centers and was unsuccessful and has not made continued efforts to achieve sobriety through outpatient services, including Alcoholics Anonymous or Narcotics Anonymous meetings and addiction counseling. She admitted at the time of trial that she was still using methamphetamine on a daily basis and that she was under the influence of the drug at that time.

Though the record shows that Elizabeth was a loving and attentive mother during visits, the visits did not occur regularly throughout the case, and Elizabeth did not take full advantage of the time she was allotted with the children. Though Elizabeth stated that she did not take drugs when the children were with her, she tested positive for amphetamine and methamphetamine when she arrived at several visits.

Several individuals who worked with Elizabeth during this case testified that Elizabeth has not made satisfactory progress and is not in a position to adequately parent these children.

Jobman, a children and family service specialist, stated that it was her opinion Lorenzo and Lillian needed permanency and that it was in their best interests to be adopted. Montgomery, also a children and family service specialist, stated her opinion that it was in the best interests of Lorenzo and Lillian to remain in out-of-home placement with the goal of adoption. Wilson, yet another children and family service specialist, stated her opinion that the best interests of the minor children required termination of Elizabeth's parental rights. Reffalt-Herrera testified that Elizabeth did not progress to a point where she would have been able to provide for the necessities and care of the children.

The Nebraska Supreme Court has stated that "[w]hen a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the child's best interests require termination of parental rights." *In re Interest of Walter W.*, 274 Neb. 859, 871, 744 N.W.2d 55, 64 (2008). The system cannot and should not allow children to languish in foster care waiting to see if the parent will mature. *In re Interest of Destiny A. et al.*, 274 Neb. 713, 742 N.W.2d 758 (2007).

Upon our de novo review, we conclude there is clear and convincing evidence to support a determination that termination of Elizabeth's parental rights is in the children's best interests. We note that Elizabeth does not challenge the findings made pursuant to ICWA. We affirm the decision of the trial court.

*Due Process; Initial Removal Pursuant*
*to Voluntary Plan.*

Elizabeth asserts she was denied due process because the children were removed pursuant to a voluntary plan and evidence from that period was cited in the order to terminate her parental rights. See *In re Interest of Joseph S. et al.*, 21 Neb. App. 706, 842 N.W.2d 209 (2014).

Elizabeth asserts her circumstances are similar to those of the parent in *In re Interest of Joseph S. et al.*, where we found a violation of due process rights because compliance during the voluntary removal period was the primary evidence to satisfy the statutory requirements for termination of parental rights.

Here, the vast majority of the evidence offered to support the State's petition was gathered from events and actions which took place after the voluntary period ended and the juvenile petitions had already been filed.

Lorenzo and Lillian were born in January 2011 and were placed with Gina and her husband in August 2011. The State filed a petition alleging the children were within the meaning of § 43-247(3)(a) in January 2012 and filed a motion for temporary custody to be transferred to DHHS. An amended petition was filed on January 10, and in February, Elizabeth pled no contest to having a history of using methamphetamine, testing positive for methamphetamine, and being unable to maintain sobriety.

In terminating Elizabeth's parental rights, the court relied on evidence presented that Elizabeth had a "chronic or worsening methamphetamine addiction that prevented her from satisfying basic needs of her children"; extensive efforts to preserve and reunify the family had failed; the children had been in out-of-home placement for at least 15 of the most recent 22 months; Elizabeth had sporadic contact with her children, could not provide safe and stable

housing, and was unable to provide monetary support because she did not obtain employment; and Elizabeth repeatedly tested positive for controlled substances.

The only meaningful evidence stemming from the period between August 2011 and February 2012 was that the children were in out-of-home placement starting August 17, 2011; that Elizabeth attempted treatment at NEPSAC and was unsuccessful in completing the course of treatment; and that the condition giving rise to the voluntary case was Elizabeth's use of methamphetamine.

The evidence shows that after the § 43-247(3)(a) petition was filed, a case plan was developed for Elizabeth with the goal that she would be able to reunify with the children. The case plan goals included the following: (1) providing a safe, stable, alcohol-free, and drug-free environment for herself and her children; (2) understanding her protective role as a parent; and (3) understanding how drug usage affects her ability to parent and has an impact on the life of her children.

After that time, Elizabeth attempted and failed two inpatient treatment programs, failed to achieve or maintain sobriety, and failed to take full advantage of outpatient treatment options available. Elizabeth tested positive for controlled substances or signed admissions that she had used. She testified at trial that she continued to use drugs on a daily basis and had used drugs before trial that day. After the petition was filed, Elizabeth lived in multiple residences, was not employed, and failed to consistently attend scheduled visitation with the children. By the time of trial, she had not progressed or met any of the objectives set forth in her case plan. It is clear that the State's motion for termination of Elizabeth's parental rights was not tied to evidence gathered during the voluntary period; rather, it was centered on services offered during the pending court case. It is clear that Elizabeth failed to meet the goals set forth in her case plan.

Procedural due process includes notice to the person whose right is affected by the proceeding; reasonable opportunity to refute or defend against the charge or accusation; reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by the Constitution or statutes; and a hearing before an impartial decisionmaker. *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004).

We cannot find that Elizabeth was deprived of due process rights simply because this case originated from a voluntary case. The record shows that Elizabeth was given notice of the allegations against her and that she was represented by an attorney throughout the pendency of the case. She had the opportunity to confront and cross-examine witnesses, present evidence, and defend against the allegations made against her. There is no evidence to suggest that Elizabeth was deprived of due process rights.

*Employee of County Attorney's Office*
*as Foster Placement.*

Elizabeth asserts her due process rights were violated when the children were placed with an employee of the county attorney's office, Gina. She asserts the placement of the children with Gina created "an appearance of impropriety and a direct conflict of interest." Brief for appellant at 13. She does not cite to any statutory authority, case law, or any other legal authority to support her argument.

Elizabeth raised this issue in the lower court when she made a motion to disqualify the county attorney's office and requested the appointment of a special prosecutor. The record shows Elizabeth made a motion to disqualify the county attorney's office, and there was a hearing on January 29, 2013.

Gina testified that she is a legal secretary in the child support department, and the record shows that she is also Elizabeth's aunt. Gina testified that the first placement was with Elizabeth's grandmother and that Elizabeth was supposed to stay in the same home to care for the children. Gina testified she received a telephone call from Elizabeth asking if Gina could give her a break and keep the children for the weekend. Gina asked if there could be another placement found for the children, and after doing background checks on Elizabeth's family, and Gina's family, there were no other family members who passed. Gina expected the placement to be temporary while Elizabeth was in substance abuse treatment, and it was her understanding that Elizabeth wanted the children placed with Gina.

Gina testified that Elizabeth had asked her whether she would be allowed to see the children if Gina adopted them and that Gina said Elizabeth could if she was not under the influence of drugs. Gina testified that she hoped the children would be allowed to return to Elizabeth's care. However, if they were not able to live with Elizabeth, Gina stated that she and her husband were prepared to adopt the children. There was no evidence presented that Gina had any intention to thwart Elizabeth's relationship with the children, so long as Elizabeth was not abusing controlled substances.

The record shows that the case was treated as if it was governed by ICWA. Under ICWA, Neb. Rev. Stat. § 43-1508 (Reissue 2008) states:

> (2) Any child accepted for foster care of preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his or her special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with:
>
> (a) A member of the Indian child's extended family;
>
> (b) A foster home licensed, approved, or specified by the Indian child's tribe;
>
> (c) An Indian foster home licensed or approved by an authorized non-Indian licensing authority; or
>
> (d) An institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

See, also, 25 U.S.C. § 1915 (2012).

There was no other family available for placement in this case, except for Gina. Gina testified that in her position at the county attorney's office, she was not supervised by the attorney in this case, but that they work in the same building, on the same floor. The court asked whether there was any evidence of receipt of information detrimental to Elizabeth as a result of Gina's position in the child support department, which would require disqualification of the office. Elizabeth stated there was no proof, but there was an appearance of impropriety and a potential conflict of interest. The State argued that there was not sufficient evidence to show the

county attorney's office was biased, and the county attorney had no control over the placement of the children.

The trial court stated:

In the absence of any specific rules of professional conduct that you believe are being violated and in view of the fact that there's evidence of -- before the court there is no direct participation or supervision in a case of this nature by a secretary in the -- in the child support division of the county attorney's office, further, in view of the fact that the placement decisions being made in the case are by a state agency, [DHHS], and there's no evidence in this case of information being shared that was gleaned in a confidential setting by counsel that is now being -- counsel for the mother that is now being used in a context detrimental to the mother, and the fact we're talking about a relative that was asked, according to the evidence before the court, whether she would adopt by the -- by the natural mother at some point, under the circumstances I don't find sufficient evidence in this case to grant a motion to disqualify the county attorney's office. So I will overrule the motion at this time.

Upon our review of the evidence, we find the trial court did not err in overruling Elizabeth's motion to disqualify the county attorney's office. Though Gina was an employee of the county attorney's office, there is no evidence of bias or evidence that Gina had any involvement in or knowledge of the termination proceedings, except in her capacity as a member of Elizabeth's family and as the foster placement for the children. Elizabeth cited no authority or any evidence in the record to support her argument that the placement was improper or that her case was unfairly administered. The totality of the circumstances, including Gina's familial relationship, her attempts to facilitate visitation and support Elizabeth throughout the termination case, and her statement that she hoped the children would be returned to Elizabeth's care, is contrary to any alleged bias. We find Elizabeth's due process rights were not violated by the placement of her children in the home of Gina and her husband.

## CONCLUSION

Upon our de novo review, we find there was clear and convincing evidence that termination was in the children's best interests and that Elizabeth's due process rights were not violated.

AFFIRMED.