IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ATTICUS B.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ATTICUS B., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

DEIONTE B., APPELLANT.

Filed October 1, 2019.    No. A-19-159.

Appeal from the Separate Juvenile Court of Douglas County: DOUGLAS F. JOHNSON, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Timothy F. Shanahan for appellant.

Donald W. Kleine, Douglas County Attorney, Anthony M. Hernandez, and Teryn Blessin, Senior Certifed Law Student, for appellee.

MOORE, Chief Judge, and PIRTLE and WELCH, Judges.

PIRTLE, Judge.

### INTRODUCTION

Deionte B. appeals from an order of the Douglas County Separate Juvenile Court terminating his parental rights to Atticus B., his minor child. Deionte argues that the court lacked clear and convincing evidence that termination of his parental rights was in the best interests of the minor child. For the reasons that follow, we affirm.

BACKGROUND

Atticus, born in February 2017, first came to the attention of the Nebraska Department of Health and Human Services (DHHS) in July 2017. A report was accepted for assessment by the Child Abuse and Neglect Hotline whereby the caller indicated the home of Deionte and Shyanna E., the natural mother of Atticus, did not have a stove or a refrigerator. The caller noted that Atticus was not bathed often and frequently was dressed only in a diaper. The caller also expressed concern that Deionte and Shyanna both used and sold drugs in the home, including methamphetamine. In August 2017 the family was referred to Nebraska Families Collaborative (now known as PromiseShip) and assigned to Melanie Nicely, a Family Permanency Specialist (FPS). At the time, a safety plan was in place due to concerns surrounding Shyanna's positive test for methamphetamines, Deionte's admitted marijuana use, and reports that Deionte and Shyanna had ongoing incidents of domestic violence between the two of them in the home. The safety plan provided Atticus with an informal living arrangement with foster parents Trisha Meehan and Liam Meehan, supervised visits for both Shyanna and Deionte, and other drug-related evaluations for Shyanna.

On September 7, 2017, Nicely visited Shyanna and Deionte in their home and spoke to the two regarding a domestic dispute that had occurred 2 days prior. Shyanna previously alleged that Deionte had beaten her with an electrical cord, however, both she and Deionte were silent about the incident throughout Nicely's visit. Nicely acknowledged in a sworn affidavit, that despite her referrals for peer-to-peer support and other services, Shyanna and Deionte failed to mitigate "safety threats related to substance abuse, mental health and domestic violence" throughout her assignment to their case.

On September 28, 2017, the State filed a supplemental petition against Deionte to adjudicate Atticus pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016), alleging that Atticus lacked proper parental care by reason of the fault or habits of Deionte, specifically alleging:

A. Deionte's use of alcohol and/or drugs places Atticus at risk for harm.

B. Deionte and Shyanna engage in domestic violence.

C. Despite services being offered to Deionte to reunify with Atticus, he failed to consistently engage in said services.

D. Deionte failed to consistently visit Atticus while he was in temporary foster care.

E. The foregoing reasons place Atticus at risk for harm.

The State also filed an ex parte order for immediate temporary custody requesting that Atticus be placed in the temporary custody of DHHS due to health and safety concerns if he remained in the home of Shyanna and Deionte at that time. The motion was granted and Atticus was placed in temporary custody of DHHS, continuing to live in the home of the Meehans.

On October 5, 2017, at the first appearance and protective custody hearing as to the supplemental petition, Deionte entered a denial of the allegations contained therein, and the continued protective custody of Atticus went unopposed. The court found that due to exigent circumstances, including substance abuse, alleged domestic violence, and the facts set forth in Nicely's affidavit, "it would be contrary to the health and safety of the minor child to be returned

home at this time." It was ordered that Atticus should remain in the temporary custody of DHHS and the matter was set for a pretrial hearing.

On May 4, 2018, the State amended the supplemental petition, additionally seeking the termination of Deionte's parental rights under Neb. Rev. Stat § 43-292(1), (2), and (9) (Reissue 2016). The State further alleged that under Neb. Rev. Stat. § 43-283.01 (Reissue 2016), reasonable efforts to preserve and reunify the family were not required due to aggravated circumstances including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse.

After several hearings and continuances, the matter concerning the adjudication of Atticus and termination of parental rights of Deionte was heard on November 20, 2018, and January 17, 2019.

At trial, Shyanna testified that she was in a romantic relationship with Deionte from May 2016 until approximately October 2017 and that the two lived together throughout most of that time. She testified that she and Deionte would use marijuana "as often as [they] could," around once or twice a day, and occasionally used cocaine. She testified that Deionte would drink alcohol "[t]hree or four times a week" and "would get so drunk he would throw up." Shyanna testified that Deionte was not employed until Atticus was a month old and that his employment only lasted around 2 or 3 months. Deionte would supplement his income by donating plasma twice a week. She noted that until near the end of their relationship Deionte would spend his money on video games and alcohol rather than help provide for Atticus. Deionte spent most of his time playing Xbox, often 12-16 hours per day.

Shyanna testified that she was concerned with Deionte's ability to parent a child because of his lack of income, aggression, and unstable emotions. She went on to discuss several incidents where she and Deionte would get into an argument and he would become physical, at one point shoving Shyanna onto Atticus' bassinet with him still inside, and hitting her on the jaw to the point where she was unable to open her jaw for a month.

Shyanna testified that throughout their relationship, Deionte attempted suicide on several occasions. Deionte told Shyanna about previous attempts and, on occasion, would leave behind notes before leaving the house for hours. Shyanna noted that Deionte never sought any type of counseling or other services to address his issues with alcohol, anger management, or domestic violence during their relationship. Furthermore, Deionte provided little to no help with the parenting of Atticus, leaving Shyanna to care for him. On one occasion, Deionte left for work, forgetting Atticus was still at home alone.

In the time that Shyanna and Deionte lived together, Deionte invited several other people to live with them, who often would use alcohol and drugs in the home. Shyanna testified that she was concerned about the criminal history of these people and would not have allowed them to move in had it been her choice. She testified that the two bedroom house was not big enough for her, Deionte, Atticus, and the six others Deionte had invited to live with them.

In terms of financial support, Shyanna testified that Deionte had two jobs during their relationship, where he was only employed 2 to 3 months making minimum wage. Deionte set aside $600 for a house deposit, but only about $500 of that was left after Deionte spent a portion of the money on alcohol. Other than the deposit, Deionte contributed approximately $100 per month

toward rent costs of $650 per month plus utilities. Deionte would not contribute to the purchase of food, diapers, or clothing for Atticus.

On cross-examination, Shyanna explained that the only financial assistance she and Deionte received was from one of Deionte's friends, Bob Cocanougher. Cocanougher would pay most of their rent each month, besides the $100 Deionte contributed, if he had it. She further testified that in the total time she and Deionte were living together, the police were called roughly eight or nine times as a result of disputes between the two.

At one point Shyanna reached out to Heartland Family Services for assistance regarding their rehousing program, but Child Protective Services got involved and Atticus became a ward of the State. At that time, Shyanna ended her relationship with Deionte and moved out of the home they shared.

Shyanna testified that she previously had a protection order for her and Atticus against Deionte, but she dropped it because she felt bad that Deionte had nowhere to go and was sleeping outside. The order was in place for 1 month. Shyanna testified that despite Deionte shoving her into a wall when she was 6 months pregnant, she did not call the police because she was afraid. She "had the ideal picture of mom, dad, and child in one home." Shyanna testified that she never pursued charges against Deionte for the incidents of domestic violence because she likely would have been charged as well.

In regard to visitation, Shyanna testified that she set up her own visits, but Deionte would often attend because he lived in the same home as Shyanna, where the visits took place. On redirect, Shyanna testified that she told Deionte to set up his own visits "several times" but he would respond that he did not have the time or would rather just do them with her.

Tanya Baker, a Family Partner with Owens and Associates, testified that she conducts supervised visits with families and receives referrals through PromiseShip. She testified that her duties are to observe and objectively document the visits between parents and their children. Baker received a referral for Deionte in August 2018, which included information from PromiseShip related to their concerns with Deionte and the frequency and duration of his visits. Between the time of referral and trial, Deionte received one, 2-hour visitation per week.

Baker testified that she gives instructions to parents to bring supplies to visits, such as food, diapers, and wipes, when necessary. Deionte, despite being reminded, did not bring supplies with him to visits until October, approximately 2 months after his visits began. Baker did testify that she never observed any issues at Deionte's visits and he and Atticus appeared bonded. She also testified that Deionte never specifically requested an increase in visits.

Baker testified that Deionte was available for all but one of his visits, to which Deionte indicated to her that his alarms did not go off and he did not receive notifications when Baker attempted to reach him via phone. On two other occasions, Deionte's visits were shortened because he had scheduled a job interview and doctor's appointment during the visitation time. Deionte's visits were always scheduled at the same time, from 9:30 to 11:30 a.m.

On cross-examination, Baker testified that Deionte mentioned to her that he would like more visits on multiple occasions, but that his case manager would be the appropriate person to handle that request.

Trisha Meehan, Atticus' foster mother, testified that Atticus first came to live with her and her husband, Liam, on August 7, 2017, and became a ward of the State in late September of that year. She testified that she was only contacted by Deionte regarding Atticus on two occasions between September and December 2017. On one occasion, Deionte reached out to arrange a visit with Atticus on the day he was placed with the Meehans. On the other occasion, Deionte requested Trisha send him photos of Atticus. Between December 2017 and May 2018, Trisha had four total text message conversations with Deionte regarding Atticus.

In April, Trisha reached out to Deionte regarding Atticus' feeding schedule and other needs in preparation for visits that were to begin soon. Later that month, Trisha again texted Deionte to clarify Atticus' feeding schedule, but she had no future conversations with Deionte via phone or in-person after that. Aside from a "Pack 'n Play" and a small package of diapers, Trisha did not receive anything from Deionte for the support of Atticus while he was in her care, nor did she prepare him for any visits with Deionte. From May 2018 to the point of trial in November, Trisha had no direct contact with Deionte regarding anything to do with Atticus.

Trisha testified that, while in her care, she brought Atticus to 55 to 60 medical appointments in the 15-month span prior to trial. Trisha testified at length regarding Atticus' medical conditions including gross motor delays, torticollis, issues with eating, and frequent ear infections. Atticus also required a number of physical therapy appointments. Trisha received special training for Atticus' needs, including direction regarding the helmet Atticus was required to wear 22 hours per day, and at-home physical therapy exercises. Despite efforts to reach out to Deionte regarding upcoming medical appointments, and the fact that Deionte's phone number was on file with the doctor's office, Deionte showed up to just one of Atticus' appointments throughout that time. While there, Deionte "sat out in the hallway, and was on his phone during the appointment." Trisha went on to testify that since she and her husband have been taking care of Atticus he has caught up in terms of gross motor skills and an Early Development Network evaluation in February 2017 revealed no further needs for Atticus.

On cross-examination, Trisha testified that Deionte would have been aware of Atticus' medical appointments because a followup was scheduled at the first appointment he attended, his permission was required for the two ear tube surgeries, and his phone number was set up to receive text alerts for upcoming appointments or when prescriptions were ordered from the pharmacy. Trisha was unable to personally testify as to whether Deionte received actual notice of the appointments via that phone number because it was formerly shared with Shyanna. She also testified that at the initial physical therapy appointment, which Deionte attended, he would have been able to hear discussions from within the room from where he was situated in the hallway.

Nicely, the first FPS with PromiseShip assigned to Atticus' case, testified that her role was to provide ongoing case management, refer for services, assess ongoing safety and risk factors, assess strengths and needs, and build support and services around those needs for the families she was assigned to. She testified that she spoke with the initial assessment team from DHHS, both Deionte and Shyanna, and Atticus' foster parents. She also reviewed the intakes that were reported to the Child Abuse and Neglect Hotline.

Nicely testified that in-person contacts with Deionte were cancelled "at least once a month" while she was the FPS. She testified that she had multiple discussions with Deionte regarding

services for domestic violence, in order to address any safety threats and reunify the family, but Deionte did not show willingness to participate. Instead, Deionte would say that "he didn't know if it was needed, or he didn't know if he wanted to participate." Nicely also testified that she would have discussed concerns regarding Deionte's drug and alcohol use with him. She testified that these concerns impose a risk of harm that Atticus might be neglected or physically harmed while in the home.

Nicely testified that during her walk-through of Deionte's home, which was required to approve visits in the home, "[t]here were piles of garbage on the back porch, there were no working smoke detectors, [and] there were empty alcohol bottles" that had not been thrown away. Deionte also did not provide information about other individuals living in the home, which was required before home visits could be approved. While Nicely was the FPS on the case, from August to October 2017, she "formed the opinion that the home was not suitable at that point for visits." She testified that Deionte had not done anything proactive, despite numerous referrals, that would have made it more likely for Atticus to be removed from foster care and placed back in the home. Nicely further testified that Deionte was not consistently participating in urinalysis, nor consistently attending visits with Atticus.

On cross-examination, Nicely testified that while assigned to the case, she only conducted one walk-through of the home, in October 2017. She testified that Deionte told her he was working at Little Caesars at the time, but did not provide written verification. While Nicely made recommendations to Deionte for courses, she did not make a specific referral for any domestic violence courses.

On the second day of proceedings, the State called the remaining four PromiseShip family permanency specialists that were assigned to Atticus' case between August 2017 and the time of trial. Each of the specialists testified that communication with Deionte was often difficult. Despite numerous attempts to suggest services to alleviate concerns, and facilitate reunification, Deionte refused to participate and would respond that he did not require the services. While there was some testimony that Deionte had brought supplies for Atticus and the two appeared bonded at times, the overwhelming testimony indicated a lack of motivation by Deionte to take proactive steps to facilitate reunification with his child. A number of walk-throughs of Deionte's home revealed it to be disorganized, cluttered with empty alcohol bottles and cigarettes, and overall not in a condition that would be approved for home visits with Atticus. The specialists testified that no progress had been made toward the goal of reunification with Atticus and they would be unable to recommend such.

The State's final witness, Caitlin Anderson, who was the FPS assigned to the case from June to November 2018, testified that it was her professional opinion that Deionte's parental rights should be terminated and Atticus should be placed for adoption. Her opinion was based on consideration of factors including the services offered and participation in such, the time the child has spent in alternative care, visitation with the child, appropriate housing, stability in employment, conversations with her supervisor and other family permanency specialists who worked on the case, and meetings with Deionte. Anderson testified that she believed it was in Atticus' best interests that Deionte's parental rights be terminated "because he does not deserve to linger in foster care as Deionte has not completed services" and has not addressed other safety concerns.

Anderson testified that during her time as FPS, Deionte made no progress toward reunification with Atticus.

At the conclusion of the case-in-chief, counsel for Deionte made a motion to dismiss and a motion for directed verdict based on the State's failure to prove a prima facie case. The juvenile court denied both motions, based on its inability to review the exhibits in evidence at that time. After a brief recess, counsel for Deionte introduced a letter from Cocanougher, which indicated that despite the fact Cocanougher would sometimes loan money to Deionte for rent, that money was always paid back on time. With that, Deionte rested his case.

In closing argument, the State argued that Deionte has continuously and repeatedly refused to provide care and support to Atticus and allowed him to remain in foster care without addressing the concerns that placed him there. The State's position is that Atticus has lingered in foster care long enough and that Deionte's parental rights should be terminated in order to facilitate adoption. Counsel for DHHS added that abandonment of the child was applicable to this case.

Counsel for Deionte argued that the evidence showed Deionte brought supplies to visits on a number of occasions, that he requested more visits, that Deionte's lack of reception to services may have been due to uncertainty of whether he was actually Atticus' father, and ultimately asked that the court allow Deionte to go through a rehabilitation plan instead of terminating his parental rights. Counsel renewed his motion to dismiss.

On January 17, 2019, the court entered an order finding that the State had proven § 43-292(1), (2), and (9) by clear and convincing evidence and that termination of Deionte's parental rights was in the best interests of the minor child.

## ASSIGNMENTS OF ERROR

On appeal, Deionte assigns that the juvenile court erred in finding sufficient evidence that termination of his parental rights was in the best interests of the minor child.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and must reach its conclusions independent of the juvenile court's findings. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

## ANALYSIS

Deionte's only assignment of error is that the juvenile court erred in finding that there was sufficient evidence to determine that termination of his parental rights was in the best interests of the minor child. We disagree. Section 43-292 provides that a court

> may terminate all parental rights between the parents or the mother of a juvenile born out of wedlock and such juvenile when the court finds such action to be in the best interests of the juvenile *and* it appears by the evidence that one or more of the following conditions exist[.]

(Emphasis supplied.) The statute then goes on to list 11 statutory bases for termination. While Deionte technically did not raise the insufficiency of the evidence on the initial statutory bases alleged in the State's amended supplemental petition and termination of parental rights, based on our de novo review in juvenile cases, we nevertheless will briefly address the statutory basis for termination, followed by the best interests analysis.

*Statutory Grounds for Termination.*

As mentioned, § 43-292 provides the statutory bases for the termination of parental rights. Any one of the 11 separate conditions under § 43-292 may serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010). Under § 43-292(2), grounds for termination exist if the parent "ha[s] substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection. . . ."

In the present case, the evidence establishes that § 43-292(2) was met and the juvenile court did not err in determining such. Shyanna testified that throughout her relationship with Deionte she was the primary caregiver to Atticus and that Deionte showed very little interest in caring for their son. Regarding his support of Atticus, Shyanna testified that Deionte "didn't get up in the middle of the night. He didn't feed him, change him, watch him. I mean he provided so little he even forgot him at the home one day." Apparently, one time Deionte left for work and 45 minutes later text messaged a friend of Shyanna that he forgot Atticus at the home and asked that the friend go get him.

Further, Deionte provided very little financial assistance or other support for Atticus, spending most of the money he had on cigarettes, video games, alcohol, and marijuana. While there is testimony that Deionte occasionally brought diapers and wipes for Atticus on his visits at the daycare, the overwhelming amount of testimony establishes that Deionte provided very little in terms of clothing, toys, food, or other supplies necessary for the care and support of Atticus both while living with him, and when Atticus remained in foster care.

Of the 17 months Shyanna and Deionte were together, Deionte had a part-time job for about 2 or 3 months. Deionte was more focused on playing video games, often 12-16 hours a day, than on being a father.

After Atticus was taken into foster care and became a ward of the State, Deionte showed little interest in taking affirmative steps to achieve the goal of reunification with Atticus. While the evidence suggests that Deionte occasionally asked Trisha for pictures of his son, and attended some scheduled visits, he did not take any steps to address the concerns that resulted in Atticus being taken into foster care in the first place. In fact, when specific services were suggested and offered to Deionte, such as counseling, anger management, domestic violence courses, or chemical dependency treatment, Deionte refused and contended that he did not have a problem and did not require any of the services offered. It is clear to us that Deionte has continued to neglect his responsibilities as a parent, and has not taken any of the necessary steps to prove otherwise.

We find that the State established § 43-292(2) by clear and convincing evidence, and the juvenile court was not in error for finding the same. As such, we need not address whether the

State's burden was met as to § 43-292(1) and (9), and we find that the State has proven a statutory ground for termination. We next turn to whether termination of Deionte's parental rights was in the best interests of the child.

*Fitness of Parent and Best Interests of Child.*

Deionte alleges that the juvenile court erred by finding that there was sufficient evidence that termination of his parental rights was in the best interests of the child. In addition to proving a statutory ground for termination, the State must show that termination is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). Such a showing must be made by clear and convincing evidence. *In re Interest of Angelica L. & Daniel L.*, 277 Neb. 984, 767 N.W.2d 74 (2009). Clear and convincing evidence means that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Zachary D. & Alexander D.*, 289 Neb. 763, 857 N.W.2d 323 (2015).

A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Aly T. and Kazlynn T.*, 26 Neb. App. 612, 921 N.W.2d 856 (2018). There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id*. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *In re Interest of Aly T. & Kazlynn T., supra*. Parental unfitness means a personal deficiency or incapacity which has prevented, or probably will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Jahon S.*, *supra*. The best interests analysis and the parental fitness analysis are fact-intensive inquires. *Id*. And while both are separate inquires, each examines essentially the same underlying facts as the other. *Id*.

We have already addressed, in part, Deionte's deficiencies as a parent in the neglect section of this opinion. In addition to the limited amount of time Deionte spent working in order to provide for and support Atticus, our biggest concern is his failure to accept responsibility for his actions and address the issues he has been confronted with. Each of the family permanency specialists assigned to Atticus testified that Deionte repeatedly turned down referrals for services designed to address the very concerns that brought Atticus to the State's attention in the first place. We find particularly concerning the incidences of violence that occurred between Deionte and Shyanna, and especially the fact that Atticus was often in the same room. On more than one occasion, Shyanna testified, Deionte shoved her so hard that she fell on top of Atticus. While Deionte and Shyanna have since separated, this does little to resolve our concerns about the temperament of Deionte and his refusal to accept responsibility and take affirmative steps to make a change.

Furthermore, Deionte's habit of excessive alcohol consumption and ongoing drug use are concerning. Shyanna testified that throughout their relationship Deionte would drink two or three, sometimes four, times a week depending on if they had the money. Deionte would become so intoxicated that he would throw up and black out. The record suggests this was an ongoing issue with multiple individuals testifying that they observed empty alcohol bottles scattered throughout Deionte's home when conducting walk-throughs in preparation for home visits with Atticus. In

addition to excessive alcohol consumption, the use of drugs in the home is also troubling. Shyanna testified that she and Deionte would use marijuana "[a]s often as [they] could, maybe once a day, twice a day, if not more or less." Occasionally, Deionte also used cocaine. Again, there is no indication that Deionte took steps to address these issues, despite being confronted with his drug use as an area of concern.

The best interests of a child require termination of parental rights when a parent is unable or unwilling to rehabilitate himself within a reasonable time. *In re Interest of Austin G.*, 24 Neb. App. 773, 898 N.W.2d 385 (2017). Here the State contends, and we agree, that Deionte's refusal to engage in the services offered to him shows an unwillingness to rehabilitate himself and make progress toward reunification. It is well established that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Octavio B. et al.,* 290 Neb. 589, 861 N.W.2d 415 (2015). Based on the facts set forth above, we find that there was clear and convincing evidence to demonstrate that Deionte was unfit and that terminating his parental rights was in the best interests of the child.

## CONCLUSION

The juvenile court did not err in finding a statutory basis to terminate Deionte's parental rights under § 43-292(2), or in finding that Deionte was an unfit parent and that termination was in the best interests of the child.

AFFIRMED.